IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RONALD NEWBERRY,

              Petitioner,

vs.

WARDEN MISTY MACKEY,

              Respondent.

CASE NO. 1:25-cv-226

DISTRICT JUDGE
DAVID A. RUIZ

MAGISTRATE JUDGE
JAMES E. GRIMES JR.

**REPORT &
RECOMMENDATION**

Petitioner Ronald Newberry has filed an Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Newberry is in custody at the Lake Erie Correctional Institution and challenges his conviction and sentence in the case *State v. Newberry*, Cuyahoga County Court of Common Pleas, Case No. CR-19-642539-A. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court deny Newberry's Amended Petition.

### Summary of facts

In habeas corpus proceedings brought by a person under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that

presumption by clear and convincing evidence. *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012).

The Ohio Court of Appeals for the Eighth Appellate District summarized the facts underlying Newberry's conviction as follows:

> {¶1} Defendant-appellant Ronald Newberry appeals his convictions for aggravated murder, murder, kidnapping, aggravated burglary, aggravated arson, felonious assault and having weapons while under disability following a jury trial in the Cuyahoga County Court of Common Pleas. The charges stemmed from an investigation into the deaths of Paul Bradley ("Paul" or "Paul B.") and his 14-year-old daughter P.B. Paul and P.B. were found dead in a burning car at a vacant property in East Cleveland on October 10, 2018.
>
> ***
>
> {¶4} On July 31, 2019, a Cuyahoga County Grand Jury indicted Ronald Newberry and two codefendants—Kodii Gibson and DeMarcus Sheeley—in a fifteen-count indictment.[ ] The indictment alleged that Newberry committed the following offenses on or about October 10, 2018:
>
>> Counts 1 and 3: Aggravated murder of P.B., in violation of R.C. 2903.01(A) and (B)
>>
>> Counts 2 and 4: Aggravated murder of Paul B., in violation of R.C. 2903.01(A) and (B)
>>
>> Count 5: Kidnapping of P.B. in violation of R.C. 2905.01(A)(3)
>>
>> Count 6: Kidnapping of Paul B. in violation of R.C. 2905.01(A)(3)

Count 7: Aggravated burglary in violation of R.C. 2911.11(A)(1)

Count 8: Aggravated arson in relation to Paul B., in violation of R.C. 2909.02(A)(1)

Count 9: Aggravated arson in relation to P.B., in violation of R.C. 2909.02(A)(1)

Count 10: Murder of P.B., in violation of R.C. 2903.02(B)

Count 11: Felonious assault of P.B., in violation of R.C. 2903.11(A)(1)

Count 12: Murder of Paul B., in violation of R.C. 2903.02(B)

Count 13: Felonious assault of Paul B., in violation of R.C. 2903.11(A)

Count 14 did not apply to Newberry.

Count 15: Having weapons while under disability, in violation of R.C. 2923.13(A)(3)

{¶5} Each of counts 1, 2, 3, 5, 6, 7, 10 and 11 carried one- and three-year firearm specifications under R.C. 2941.141(A) and 2941.145(A). Count 13 carried an accelerant specification under R.C. 2941.1425(B).[2]

[FN2] The indictment also included capital specifications under R.C. 2929.04(A)(5) and 2929.04(A)(7) but the state voluntarily dismissed those specifications before trial.

{¶6} The prosecution's theory of the case was that Newberry, Gibson and Sheeley participated in a "crime spree" on October 10, 2018, which culminated

3

in the murders of Paul and P.B. They broke into Paul's house in Bedford and kept Paul and P.B. detained there between 3 a.m. and 6 a.m. while they ransacked the house and stole items of value. Then they drove Paul and P.B.—in a silver Buick LaCrosse that Paul was renting—to an abandoned house on Wadena Avenue in East Cleveland and kept them there for over two hours while Gibson called his girlfriend to bring him a gasoline can and while Gibson and Sheeley walked to a nearby gas station, and back, to fill it up. Shortly after 9 a.m., they drove Paul and P.B.—again in Paul's car—to a vacant lot on Savannah Avenue in East Cleveland, where they shot P.B. to death and burned Paul alive. Newberry, Gibson and Sheeley used Newberry's car—which had been recently purchased in Newberry's mother's name—throughout these events. Newberry returned the car to the dealership in an attempt to lose evidence and conceal his involvement in the crime. When investigators suspected Newberry's involvement, he and his mother created a fake person—"Jamaican Shawn"—to conceal Newberry's participation in the murders. The state readily admitted that its case against Newberry was circumstantial.

{¶7} The defense did not dispute that someone broke into Paul B.'s house, robbed him, kidnapped both him and his daughter and brutally murdered them. The defense did not even dispute that Newberry's car was used in the commission of those offenses. But the defense was adamant that Newberry was not involved in those crimes. The defense argued to the jury that Newberry routinely allowed others to use his car and phones and said that all the circumstantial evidence tying Newberry to the murders was explained because Newberry allowed others to use his car and phone at the time of the crimes. Newberry voluntarily turned himself in, spoke to the police and consented to the collection of his DNA, all because he knew he did nothing wrong. He returned his car because he knew his friends had committed a crime in it.

4

*State v. Newberry*, No. 111431, 2023 WL 6475159, at *1–2 (Ohio Ct. App. Oct. 5, 2023).

At his arraignment, Newberry appeared with retained counsel Carolyn Ranke. Doc. 20-1, at 43 (Exhibit 8).[1] In April 2021, about a year before trial, Attorney Ranke filed a motion to withdraw as counsel because she had discovered that a potential state witness was an existing client. Doc. 20-1, at 45 (Exhibit 9). The trial court granted the motion, *id.* at 47 (Exhibit 10), and appointed for Newberry attorneys Kevin Spellacy and Walt Edwards, *id.* at 938 (Exhibit 44).

A jury trial began in early 2022. Doc. 20-2, at 33. The Ohio court of appeals continued:

> **A. Voir Dire**
> {¶9} During voir dire, prospective juror No. 31 requested a sidebar conference and disclosed that the juror's daughter "is friends with the victim's daughter." The juror reported that this fact would not affect his ability to be fair and impartial. The juror had not spoken with his daughter "for at least four years." Neither party moved to exclude juror No. 31 and the juror served on the jury.
>
> **B. Waiver of Potential Conflict**
> {¶10} Before opening statements began on March 7, 2022, the trial court discussed several preliminary matters with the parties including a potential conflict that had been identified with respect to one of the defense counsel.
>
> {¶11} The prosecutor related to the court that the state had "discussed several times off the record"

---

[1]    In this report and recommendation, all of the citations to the docket refer to the ECF document and page number shown at the top of the page.

5

with the defense that one of the defense attorneys had previously represented Joseph D. Marché—an East Cleveland police officer who was involved in the investigation of the case as a detective—"and others in East Cleveland." The prosecutor noted that the representation was in a civil case and requested "that we go on the record and waive any potential conflicts."

{¶12} Defense counsel then explained that he previously represented Marché and approximately three other East Cleveland employees in "a civil matter where * * * a citizen[ ] had brought an action again[st] East Cleveland's police department for not being accredited, for not having their shooting records in line or qualifying records, not having their continuing education, things like that." Counsel said that he had filed a motion to withdraw in that matter and the case was ultimately dismissed by the trial court. Counsel stated that he did not recall ever speaking with Marché about that civil case and described that counsel's role had been limited to gathering records from state agencies and producing those records to the trial court. Counsel then said as follows:

> Nothing about this case or any other case, for that matter, was ever discussed. I've other cases against the Commander [Marché] where I've cross-examined him. I have no problem doing my job in this case. I didn't learn anything from that representation about my client or any other client, for that matter.

{¶13} Immediately after defense counsel's explanation, the trial court discussed the matter with Newberry, as follows:

> THE COURT: Mr. Newberry, is that okay with you? After that's all been disclosed, are you okay?

6

[NEWBERRY]: Yes.

{¶14} The trial court then asked counsel for the parties if there was anything else they would like to put on the record regarding the potential conflict issue. Counsel had nothing further to say about it.

## C. The State's Case
{¶15} The state called nineteen witnesses in its case-in-chief.

## 1. The Examination of John Hartman
{¶16} John Hartman testified that he is employed as a police sergeant with the East Cleveland Police Department. He said he has been a police officer in East Cleveland for six years and was promoted to the rank of sergeant in August 2021.

{¶17} Hartman was working as a patrol officer on October 10, 2018. At around 9:30 a.m. that day, he responded to a vacant field on Savannah Avenue in East Cleveland regarding a report of a vehicle on fire. As Hartman arrived, he saw a car on fire. The fire department was already on scene and working to extinguish the fire.

{¶18} Hartman and other officers who responded to the scene that day wore city-issued body-worn cameras. The state played a video recording from one of those cameras. The video depicts a car parked on a grassy lot between two houses. The car's trunk is partially open and flames stream from the vehicle. Firefighters walk around the car, dousing the car with water from a firehose.

{¶19} Hartman testified that one of the firefighters notified him that there were two bodies inside the vehicle. Hartman approached within three feet of the car and smelled the odor of burnt flesh. He saw two people in the back seat; they were both deceased and "extremely burned." He observed that both people appeared to be bound at the wrists and "[i]t looked like they were wrapped with cloth." Hartman

then notified his supervisors and began to "establish the crime scene."

## 2. The Examination of Jennifer Heard

{¶20} Jennifer Heard testified that she met Paul B. in 2003 and they dated "on and off" from that point forward. They have three children together. Paul also had other children, including P.B., for whom Heard is not the mother.

{¶21} Paul served a three-year sentence in federal prison for drug trafficking. After Paul's release from prison, he and Heard lived together until 2018. They bought a house on Gould Avenue in Bedford, Ohio in 2013 and Heard stayed there "on and off" over the years. The house was a two-story, single-family residence with a detached garage.

{¶22} Heard never knew Paul to hold a steady job after his release from prison but he had money such that he could pay for household expenses and basic needs and provide for his children. He also liked to go to the casino and often he would go seven days a week. Paul gambled with large sums of money, thousands of dollars at a time. Paul had over $5 million in receipts at the Jack Casino alone, owned two properties and used at least two phones. She said she believed Paul made his money through gambling.

{¶23} In June 2018, Paul called Heard and asked her to drive to meet him at a hotel in the Brecksville–Broadview Heights area of Ohio. When she arrived, Paul put a black duffle bag in the back of her car; the bag was branded from the Jack Casino. Heard was stopped by the Ohio State Highway Patrol on her way home from the hotel. Troopers searched the bag, finding that it contained approximately $345,000 in cash. Heard and Paul never talked about why the bag held that much cash.

{¶24} P.B. entered the ninth grade at school in August 2018; she was living with Paul at the house on Gould Avenue that fall.

8

{¶25} In September and October 2018, Paul was renting a Buick, which had out-of-state license plates. It was his habit to rent cars, as opposed to buying a vehicle, after his release from prison.

{¶26} Heard drove to the Gould Avenue house at around 11:30 p.m. on October 9, 2018, to deliver P.B. a bookbag that P.B. had left at a relative's house the weekend before. Heard parked in the driveway and called Paul, who was home with P.B. at the time, and P.B. came outside and grabbed the bag from Heard. P.B. kissed Heard's 16-month-old son, who was in the car with Heard, then went back inside the house.

{¶27} Heard drove around the corner to Paul's sister's house, where she stayed that night. She woke up around 6:45 a.m. on October 10, 2018, and called Paul's and P.B.'s phones which they did not answer. Later that morning she drove to the Gould Avenue house and found that the street was blocked off by emergency vehicles. She was informed that Paul's vehicle had been found, burned, in East Cleveland and that Paul and P.B. had been found deceased inside of it.

{¶28} Heard was allowed back inside the Gould Avenue house on October 11, 2018. She found that each floor of the home was "[r]ansacked." She took an inventory and reported to police that several items of value were missing, including two PlayStation videogame consoles and controllers, a pair of burgundy shoes, a Ferragamo belt and Paul's earrings and watch. She identified a picture taken of Paul's son when he went to prom, which she said depicts the son wearing the Ferragamo belt that was taken.

{¶29} On cross-examination, Heard admitted that she never saw Paul and Newberry together. She did not know Newberry prior to this case and did not know the extent of the relationship, if any, between Paul and Newberry or the degree to which they ever had contact.

9

### 3. The Examination of Michael Griffis

{¶30} Michael Griffis testified that he is employed as a police officer by the city of Solon and serves as a narcotics detective with the Southeast Law Enforcement ("SEALE") narcotics task force. He described SEALE as "a multi-jurisdictional task force" that primarily investigates drug trafficking. He testified to the following facts relevant to this investigation.

{¶31} Before Paul B.'s death, law enforcement officers suspected that he was involved in "heroin trafficking." In 2015, Griffis was involved in an investigation targeting Paul; officers bought approximately ten grams of heroin from Paul through a confidential informant. That investigation ended when the confidential informant stopped cooperating.

{¶32} On cross-examination, Griffis admitted that drug traffickers often use rental cars to hide their identity and avoid forfeiture.

{¶33} On October 10, 2018, Griffis conducted a welfare check at Paul B.'s house in the late morning or early afternoon. He and another detective found the rear door open. They entered the house and saw a red liquid on the floor in several rooms. The odor of gasoline was "really strong" so they backed out of the house and contacted the gas and electric utility companies and the fire department to make sure it was safe for them to enter. The gas and electricity services to the home were cut off for safety. Once the house was rendered safe, Griffis and the other detective went through the property and found no one inside. The house looked like it had been "tossed."

### 4. The Examination of Christopher Wilson

{¶34} Christopher Wilson testified that in October 2018 he was employed as a special agent with the Ohio Bureau of Criminal Investigation ("BCI").

{¶35} On October 10, 2018, Wilson responded to the Savannah Avenue crime scene at approximately 11:48 a.m. to photograph the scene. He observed two bodies in the back seat of the burned-out vehicle; the victims appeared to have their hands bound. One was positioned with the head facing the driver's side of the vehicle; the other was positioned behind the first, with the head facing the passenger side. Wilson observed a "pinkish liquid drip stain" on the outside of the vehicle, near the gas tank.

{¶36} After photographing this scene, Wilson drove to Paul B.'s home on Gould Avenue in Bedford to take photographs and assist with the processing of evidence there.

{¶37} There was a "strong chemical odor" when he entered the home. There was a "reddish liquid" on the "floor, furnishings, and household items throughout the house"; the State Fire Marshal's Office collected samples of the liquid for testing as a suspected accelerant. The house "appeared to have been rummaged through." In one of the bedrooms, there were "drawers from the nightstand pulled out and various household items strewn throughout the floor."

{¶38} There were stains on a wall and closet on the first floor of the home that tested presumptively positive for blood. There was a fragment of a blue examination glove on the floor of the living room near the blood stains; it appeared that the suspected accelerant was on the glove.

{¶39} There were items "consistent with drug activity" located in the basement, including blender components, weights and a digital scale.

{¶40} BCI collected the items of physical evidence identified as potentially relevant to the investigation. BCI also collected "blind swabs" of various surfaces at the home, to test for the "presence of skin cells and potentially extract DNA profiles from those skin cells."

11

### 5. The Examinations of Jeffrey Koehn and Mollie Jordan

{¶41} Jeffrey Koehn testified that he has been employed as a fire and explosion investigator by the Ohio State Fire Marshal's Office for twelve and a half years. He said he was a firefighter and fire investigator in Trumbull County for thirteen years before joining the Fire Marshal's Office and remains a part-time firefighter in Geauga County. The state offered Koehn as an expert in determining the origin and cause of fires and explosions and the defense stipulated to his qualifications.

{¶42} Mollie Jordan testified that she has been employed by the State Fire Marshal's forensic lab for eleven years. The state offered her as an expert in fire debris analysis and the defense stipulated to her qualifications.

{¶43} Taken together, their testimony established the following facts and conclusions relevant to this investigation.

{¶44} Koehn was called to the Savannah Avenue crime scene on October 10, 2018. He smelled the odor of gasoline and "burnt flesh" while he was processing the scene. The odor of gasoline was "very strong," such that one could smell it out to 20 feet from the vehicle. "Depending how the wind blew," he said, "you could get it even further away." Koehn learned that the burned-out vehicle was registered to a rental agency in Cleveland and that the vehicle had been rented to Paul B.

{¶45} Koehn examined the vehicle at the scene and later processed the vehicle for evidence at the medical examiner's office. A hole was found on the underside of the vehicle, surrounded by a "red stain"; this was later determined to be a bullet hole surrounded by blood. Blood stains were also found in the vehicle. Bullets and cartridge cases were found on the passenger side in the rear seating compartment. There was a "reddish pinkish liquid"

12

on the outside of the vehicle on the rear passenger side. Samples were taken from the interior of the vehicle and from the clothing on Paul's and P.B.'s bodies and tested for gasoline.

{¶46} Jordan conducted forensic tests on these samples. Every sample taken from inside of the burned-out car tested positive for gasoline, including samples taken from the clothes of the victims.

{¶47} Koehn's expert conclusion was that the vehicle fire was caused by a person who intentionally set fire to the vehicle by applying an open flame—most likely a lighter or a match—to gasoline, which had been intentionally applied to the vehicle and the victims. Koehn's analysis of the scene led him to conclude that the fire had spread from the front of the car—where the fire had been hot enough to melt the car's windshield and aluminum hood—to the rear. He also concluded that the fire spread from the interior of the vehicle to the exterior.

{¶48} Later, Koehn examined the dark blue 2010 Ford Edge that Newberry had been using in October 2018. A trained accelerant-detecting dog alerted to the exterior of the car and various places inside the car. Koehn collected eight samples from the vehicle.

{¶49} Jordan conducted forensic tests on these samples. A sample taken from the front driver's seat of Newberry's car tested positive for gasoline, as did a sample taken from the "rear carpet area" of his car. A sample taken from plastic bubble wrap in Newberry's trunk tested positive for gasoline and "medium petroleum distillate." Medium petroleum distillates include charcoal lighter fluid, paint thinner and tiki torch fuel.

{¶50} On cross-examination, Koehn admitted that no investigator tested the clothing of any living person for the presence of accelerants. He further admitted that he could not tell how much gasoline was present in the Ford Edge; it is possible that there were only "drops" of gasoline there. He further admitted that

13

it is possible to transfer gasoline from one item to another. He continued as follows:

> DEFENSE COUNSEL: [I]f I cut lawns for a living, right, and I'm pouring gasoline into weed whackers, blowers, lawnmowers, I get in my truck everyday, am I going to have gasoline on my seat?
>
> A: It's possible.

{¶51} Koehn said he was not able to say whether the gasoline detected in the Ford Edge was "transfer material."

## 6. The Examinations of Joseph Stevens and Christa Rajendram

{¶52} Joseph Stevens testified that he is employed as a fire investigator for the State Fire Marshal's office. He said he has been in that role for seven years and was employed as a firefighter for 20 years before that. The state offered him as an expert in determining the origin and cause of fires and the defense stipulated to his qualifications.

{¶53} Christa Rajendram testified that she is employed as a forensic lab supervisor by the State Fire Marshal Forensic Lab. She said she has worked at the lab for approximately 28 years, detecting and analyzing ignitable liquids, among other things and has a Ph.D. in chemistry. The state offered her as an expert in the field of fire debris analysis and the defense stipulated to her qualifications.

{¶54} Taken together, their testimony established the following facts and conclusions relevant to this investigation.

{¶55} Stevens responded to Paul B.'s Gould Avenue home on October 10, 2018, after police officers approaching the home "smelled the fumes from ignitable liquid coming out of the house." When he

14

arrived, he also smelled "a distinct odor of gasoline" at the house.

{¶56} Stevens walked through the home and saw a "pinkish reddish" liquid throughout the house. Stevens collected three samples of the liquid from various places inside the home and submitted them to a laboratory for identification.

{¶57} Rajendram forensically tested the samples collected by Investigator Stevens from Paul B.'s home. The red liquid on the samples was a mixture of gasoline, a medium to heavy petroleum distillate and a petroleum-based oil. Petroleum-based oils include motor oil and transmission fluid.

{¶58} Stevens identified that there were a couple pieces of paper in the basement of the home that someone had twisted up, indicating that the person intended to "control the burn of that particular piece of paper." His training told him that a person can use a twisted piece of paper like he found "as a wick or something to * * * initiate and ignite" a flammable liquid. The "pinkish reddish" liquid that had been found throughout the house was also found on these two twisted pieces of paper.

{¶59} Through his examination, Stevens concluded that a person or multiple people had poured an ignitable liquid throughout the home, including in the basement and on the first and second floors of the home. Stevens found no fire damage inside the house but he noted that there was a hot-water tank and a furnace in the basement and a gas stove in the kitchen, among other possible "ignition sources." He explained that the fumes from the ignitable mixture poured throughout the house could have ignited from these sources, like the pilot light of one of the gas appliances.

{¶60} On cross-examination, Stevens admitted that the wicks he found—the twisted pieces of paper— had not been burned. He admitted that it did not look like there had been any fire at the house. He did

15

not know how long the ignitable mixture had been in the house and did not know how long it takes for gasoline to evaporate.

### 7. The Examination of Phillip Howell

{¶61} Phillip Howell testified that he is employed as a police detective with the City of East Cleveland.

{¶62} On October 16, 2018, Howell talked to a homeowner on Savannah Avenue who maintained a video surveillance system. Howell obtained a search warrant and gathered the recording system for review.

{¶63} On November 9, 2018, Howell obtained a gas-station owner's consent to collect recordings from the gas station's video surveillance system. The gas station was located on Euclid Avenue near the Savannah Avenue crime scene.

{¶64} On cross-examination, Howell admitted that he did not inquire as to which employees were working at the gas station on October 9 and 10, 2018. He also did not ask for transaction history like credit-card receipts from those days.

{¶65} On November 10, 2018, Howell went to an abandoned residence on Wadena Avenue in East Cleveland, where there "was kind of * * * like a dump site." The home was "right around the corner" from the Savannah Avenue crime scene and investigators "had information that the suspects were at that residence" with Paul and P.B. Howell searched the outside of the residence and found examination-gloves—some blue and others clear—scattered around the home's driveway and backyard. The gloves were collected as evidence.

{¶66} On cross-examination, Howell admitted that no investigator went into the house at the "dump site" on Wadena Avenue, despite investigators' belief that the site was the staging area for the homicides.

16

{¶67} On November 12, 2018, Howell went to a CPR Cell Phone Repair store in Mayfield Heights, Ohio based on "information that one of the suspects had taken a PlayStation from the victim's house in Bedford and that the item was there at that CPR store." Howell collected a PlayStation videogame console from the store as evidence.

{¶68} On cross-examination, Howell admitted that no investigator collected security-camera recordings from that store.

## 8. The Examination of James Kooser

{¶69} James Kooser testified that he has been employed as a firearms and tool marks examiner by the Cuyahoga County Regional Forensic Science Laboratory for approximately five and a half years and was a Cleveland police detective for over 30 years before that. The state offered him as an expert in the field of firearm and tool mark examination and the defense stipulated to his qualifications. He testified to the following facts and conclusions relevant to this investigation.

{¶70} Kooser examined two spent bullets and five fired cartridge cases found in the burned-out Buick Lacrosse, as well as two spent bullets recovered from P.B.'s body. He determined that all five of the fired 9 mm cases were fired from the same Glock pistol. He determined that all four spent bullets—which were each 9 mm caliber—were fired from the same gun, which could have been manufactured by one of several manufacturers, including Glock. Kooser said it was his belief that all the bullets and all the cases were fired from the same Glock pistol.

## 9. The Examination of Curtiss Jones

{¶71} Curtiss Jones testified that he is employed by the Cuyahoga County Medical Examiner's Office as a supervisor for 19 years in the trace-evidence unit. The state offered him as an expert in trace evidence analysis and the defense stipulated to his qualifications. He testified to the following facts and conclusions relevant to this investigation.

17

{¶72} The medical examiner's office received the silver Buick LaCrosse containing Paul's and P.B.'s bodies on October 10, 2018. Jones removed Paul and P.B. from the vehicle and processed trace evidence from their bodies.

{¶73} Paul was in "the rear bench seat of the vehicle with head towards the driver's side of the vehicle and facing forward in the vehicle." There was burned white fabric, possibly from a "hooded garment," around his neck. He also had burned green fabric around his neck, which could have been tied in a knot. He had a "USB style charging cord" wrapped around his wrists and knotted into a binding; a piece of clear tape was found melted onto the cord. He had an "orange electrical extension cord" wrapped around his ankles and knotted into a binding.

{¶74} P.B. was also in the back seat, oriented with her head towards the passenger side. P.B.'s wrists and ankles had not been bound.

{¶75} Five cartridge cases and two spent bullets were found in the back seat of the vehicle.

{¶76} The medical examiner's office received Newberry's Ford Edge for processing on November 29, 2018. Jones collected samples from inside and outside the vehicle to look for bodily fluids, hair and DNA.

**10. The Examination of Andrew Harasimchuk**
{¶77} Andrew Harasimchuk testified that he is a special agent with BCI and has been employed in that capacity for seven years.

{¶78} East Cleveland police asked BCI to process Newberry's Ford Edge for blood and gunshot residue. Harasimchuk and another special agent, Dan Boerner, processed the vehicle on November 6, 2018. Harasimchuk understood that the vehicle had been at an automobile dealership before East

18

Cleveland police impounded it; the vehicle had been "detailed"—cleaned—twice before his examination.

{¶79} Harasimchuk did not test for gunshot residue because the cleanings made the test futile. He did not find blood anywhere on the inside or outside of the car.

## 11. The Examination of Lisa Moore

{¶80} Lisa Moore testified that she is employed as a DNA analyst by the Cuyahoga County Regional Forensic Science Laboratory, part of the medical examiner's office; she has been in that role since 2002. The state offered her as an expert in the field of forensic DNA testing and analysis and the defense stipulated to her qualifications.

{¶81} Moore swabbed both sides of the examination-glove fragment found in Paul B.'s house. She found DNA on the swab and entered the DNA profile in the Combined DNA Index System ("CODIS"), which revealed a preliminary association with Kodii Gibson. The DNA matched Gibson as the "major contributor" and one unknown contributor. There was positive match support for Newberry as the unknown minor contributor. The data generated during Moore's processing of this sample was sent to an outside lab operated by a company called Cybergenetics.

{¶82} There was no match support for Newberry, Gibson or Sheeley found on swabs taken from various places on the burned-out Buick LaCrosse, in Paul's house and on the ligatures around Paul's body. The only DNA found on those swabs was Paul's.

{¶83} The DNA from many of the samples collected from Newberry's Ford Edge matched to Newberry. Samples from the rear seating area matched to Newberry and Quentin L. Palmer. A sample from the rear passenger door hand grip matched to Sheeley. A sample taken from the rear passenger door armrest showed positive match support for

Sheeley and Palmer—and P.B. But the samples from the armrest were not conclusive.

{¶84} On cross-examination, Moore admitted that it makes sense that Newberry's DNA would be in the Ford Edge if Newberry used it frequently. She further admitted that a passenger sitting in Newberry's car might pick up some of Newberry's DNA. She admitted that it is possible that the passenger could then deposit Newberry's DNA on another object sometime later.

{¶85} Moore admitted that, of the DNA she found on the piece of the blue glove found in Paul's home, approximately 95 percent matched to Gibson. The remaining DNA matched to a minor contributor. While there was positive match support that the minor contributor was Newberry, the match was considered inconclusive according to the medical examiner's office's standards at the time of the test.

{¶86} On redirect, Moore testified that Cybergenetics' TrueAllele software has been peer reviewed and was validated by the medical examiner's office.

## 12. The Examination of Quiana Gilbert

{¶87} Quiana Gilbert testified that Kodii Gibson is Gilbert's child's father. In October 2018, Gibson would "hang around" Newberry and Sheeley; he had done so for about six months. She used to see the three men together about once a month.

{¶88} On October 9, 2018, Gibson drove Gilbert to her workplace in her car, dropping her off at around 3 p.m. Newberry and Sheeley were also in the car on the drive. The plan was for Gibson to pick Gilbert up at 11 p.m. when her shift ended but at some point Gibson texted her and made clear that Gilbert needed to find a different way to get home. Gibson arranged for Sheeley's girlfriend to pick Gilbert up from work and take her home but Gilbert ultimately decided to get a ride home from a co-worker. Gilbert

and Gibson were texting throughout the night of October 9, 2018.

{¶89} Gilbert woke up at 7 a.m. on October 10, 2018 and Gibson had not yet returned her car. She texted him to ask where her car was. That morning, she received a call from Gibson about a gas can and, based on that conversation, brought a gas can from her house to Wadena Avenue in East Cleveland. Gibson's grandmother lived on Wadena. When Gilbert arrived at Wadena, she saw Gibson standing next to an abandoned house located two doors down from Gibson's grandmother's home. She did not see her own car. She pulled into the driveway of the abandoned house and she saw Newberry's vehicle there. She did not see Newberry.

{¶90} Gibson walked to the car that Gilbert was in, retrieved the gas can from her and gave her the keys to her car. She learned that her car was parked "[o]ff of 116th," the street on which Sheeley lived.

{¶91} After giving Gibson the gas can, Gilbert did not see him until the next day (October 11, 2018). When she saw him next, Gibson had a red duffle bag that said "JACK Casino" on it; he also had "[a] game system and a belt." She had never seen Gibson with those items before. There came a time that Gilbert went with Gibson to take the gaming system to a business called "CPR"; Gibson said the gaming system was broken.

{¶92} The state played surveillance-camera footage from the gas station located at the intersection of Wadena Avenue and Euclid Avenue. According to the time stamps on the recording, the recording captures the outside of the gas station during the following windows on October 10, 2018: 12:41–12:48 a.m., 7:40 a.m., 7:47 a.m., 8:10–8:16 a.m. and 8:29–8:34 a.m.

{¶93} The state played the portion of the recording captured between 12:41 and 12:48 a.m.[3] The recording shows a dark-colored vehicle pulling up to

a gas pump; Gilbert identified the vehicle as Newberry's. Two people get out of the car; Gilbert identified one as Gibson and the other as Newberry. The person identified as Newberry exited the vehicle from the rear passenger door. The person identified as Gibson appears to interact with a gas station employee while the person identified as Newberry appears to walk around the outside of the gas station using a cell phone. Gibson gets back into the driver's seat of the vehicle and, a few minutes later, drives in reverse for a few feet. Newberry enters the rear passenger seat and the vehicle drives away from the station at 12:48 a.m.

> [FN3] The recording is choppy, seeming to capture a frame every four seconds or so.

{¶94} The state played the portions of the recording captured at 7:40 and 7:47 a.m. The recording shows a dark-colored vehicle driving through the station's lot and exiting the lot at 7:40 a.m.; Gilbert identified the vehicle as Newberry's. The recording shows a dark-colored vehicle pulling into the lot at 7:47 a.m.; Gilbert again identified it as Newberry's and said the car was traveling through the parking lot in the direction of Wadena Avenue.

{¶95} The state played the portion of the recording captured between 8:10 and 8:16 a.m. The video shows two people walking in the gas station's parking lot toward the station, appearing to come from the direction of Wadena Avenue. Gilbert identified them as Gibson and Sheeley. The person identified as Gibson appears to make a phone call at (according to the timestamp) 8:13 a.m.; Gilbert said this was around the time that Gibson called her to have her bring him a gas can. The men identified as Gibson and Sheeley then walk away from the station through the parking lot in the direction of Wadena Avenue.

{¶96} The state played the portion of the recording captured between 8:29 and 8:34 a.m. The recording

shows two people walking in the gas station's parking lot toward the station, appearing to come from the direction of Wadena Avenue. Gilbert identified them as Gibson and Sheeley and identified that Gibson was holding the gas can she had dropped off to him at the abandoned house on Wadena. The two are seen outside the gas station, with Gibson leaving view of the camera for a time, until 8:34 a.m., at which time they exit the gas station through the parking lot in the direction of Wadena Avenue with the gas can.

{¶97} On cross-examination, Gilbert admitted that she did not see Newberry in the surveillance video recordings after 12:48 a.m. She admitted that she could not tell from the recordings who was driving Newberry's vehicle in the later recordings.

{¶98} Gilbert testified that she was texting with Gibson throughout the night of October 10, 2018, and said she was concerned for Gibson's safety. She testified that she understood Gibson was with Newberry and Sheeley that night.

{¶99} On cross-examination, Gilbert admitted that Gibson told her to bring the gas can because her car needed gas, which was a lie. She admitted that Gibson has lied to her in the past.

{¶100} Gilbert further admitted that she had criminal charges filed against her for lying to the Cleveland Heights Police Department with respect to a police chase in which Gibson had been involved. The incident occurred a couple weeks before October 10, 2018. She further admitted that those charges were dropped in exchange for her testimony against Newberry.

{¶101} Gilbert further admitted that she told police in November 2018 that when she got to Wadena Avenue with the gas can, she saw Gibson coming from Newberry's car (as opposed to standing outside the house, as she testified). She further admitted that she first told police that she had thrown away

23

the videogame console (as opposed to taking it to CPR as she testified).

{¶102} On redirect, Gilbert said that she lied in that first interview because Gibson had been arrested the day before and she was concerned about him.

### 13. The Examination of Jacob Kunkle

{¶103} Jacob Kunkle testified that he is employed as a supervisory senior resident agent with the Federal Bureau of Investigation and is now in charge of the FBI's Canton and Mansfield offices. He said he is one of about 80 special agents nationwide that are assigned to the FBI's Cellular Analysis Survey Team for which he received specialized training in locating cell phones based on the records of cellular-communications providers. The state offered him as an expert in historical location analysis and the interpretation of cell-phone records; the defense did not object to his qualifications.

{¶104} Kunkle testified that communications providers record the date and time of communications that occur from a particular cell phone, the parties involved, the duration of the communication and the cell-phone tower used. The records further identify which side of a tower, which "sector," a communication used. "[I]f your phone makes or receives a communication," he explained, "it selects the strongest and clearest signal from one of those towers." Many times, that is the closest tower, but not always. In the Cleveland area, this information can locate a cell phone within, generally, a "few square mile area." He described this analysis as "a piece to the puzzle," one that cannot "precisely locate someone." He said the analysis "just gives you a general idea of where the phone was and whether it was in a particular area on a given date and time." He said that when he performs this analysis, many times he has "no knowledge of who possessed the phone on a given date or time." The analysis also does not identify the content of the communications.

24

{¶105} Kunkle analyzed call detail records from T-Mobile for cell-phone numbers associated with Gibson and Newberry, one ending in -1900 (Gibson's) and the other ending in -6116 (Newberry's), on October 10, 2018.

{¶106} Between 2 a.m. and 4 a.m., there was "quite a bit of activity" on the phone ending in -1900, "and that activity indicates that that phone moved from the East Cleveland area down into the Bedford area during that time period." There was only one call on the phone ending in -6116 in that time window; it was "down in the Shaker Heights area" at 2:21 a.m.

{¶107} Between 4 a.m. and 6 a.m., there were about 51 calls made to or from the phone ending in -1900 and the records "indicate that this particular phone was down in the Bedford area of Ohio" at that time. There was no activity noted from the phone ending in -6116, so the records provide no information about where that phone was during that window.

{¶108} Between 6 a.m. and 8 a.m., the -1900 number used a tower in Maple Heights and then moved into the East Cleveland area. There were two outgoing calls and one incoming call between 6:55 a.m. and 7:58 a.m. on the -6116 phone "which was up in the East Cleveland area." Both phones used the same side of the same tower for several calls between 6:55 a.m. and 7:58 a.m. on October 10, 2018.

{¶109} Between 8 a.m. and 8:30 a.m., both phones again used the same side of the same tower for communications, indicating that they were within the same several square-mile area in that window.

{¶110} On cross-examination, Special Agent Kunkle admitted that the list of phone towers he has from the service provider would not show which towers, if any, were not functioning—for maintenance or otherwise—on October 10, 2018. He also did not investigate what, if any, potential obstructions exist in the relevant areas that may have prevented a cell phone from connecting to the closest tower on

25

October 10, 2018. He also did not know the range of the towers at issue.

**14. The Examination of Jennifer Bracamontes**

{¶111} Jennifer Bracamontes testified that she is employed as a DNA analyst at Cybergenetics and has been so employed for ten years and that she runs DNA data through Cybergenetics' TrueAllele software, which performs DNA interpretation. The state offered her as an expert in DNA interpretation and the defense did not object to her qualifications. She testified to the following facts and conclusions relevant to this investigation.

{¶112} Cybergenetics' TrueAllele software "is a computer system that uses math and statistics and sampling to separate out contributors of DNA mixtures or samples that have more than one person present in them"; it is "one type of probabilistic genotyping software."

{¶113} On June 7, 2019, the medical examiner's office sent Cybergenetics the DNA data from the glove fragment found at Paul B.'s house, along with reference samples for the victims and suspects. After running the data through the TrueAllele software, it was determined that there were "two inclusionary match statistics." There was a match between the glove and Gibson, which was "16.5 octillion times more probable than a coincidence." There was also "a match between the glove and Mr. Newberry" which was "182,000 times more probable than a coincidence." Bracamontes explained that only one in 3.76 million people would match as strongly as Newberry did. She further explained that the software inferred that Gibson contributed around 85% of the DNA found in the sample and Newberry contributed around 6%; the remaining 9% was from an unknown person.

{¶114} On cross-examination, Bracamontes admitted that the TrueAllele software is only used in 10 of the nearly 400 crime laboratories in the country. She further admitted that Cybergenetics is

26

a for-profit company that had collected $8,500 from the prosecution for developing the reports in this case and would collect more as a result of her testimony at trial. Finally, she admitted that Cybergenetics does not have "any reporting thresholds" so it "report[s] whatever comes out" from the software's analysis of the data.

{¶115} On redirect, Bracamontes said the company would have had no problem reporting to the prosecutor's office if there had been support for excluding Newberry as a contributor to the DNA on the glove fragment.

**15. The Examination of Dr. Joseph Felo**

{¶116} Dr. Joseph Felo testified that he is employed as a forensic pathologist and the Chief Deputy Medical Examiner for Cuyahoga County. He said he has been employed as a forensic pathologist for over 24 years. The state offered him as an expert in forensic pathology and the defense stipulated to his qualifications. He testified to the following facts and conclusions relevant to this investigation.

{¶117} Dr. Andrea McCollom performed the autopsies on Paul and P.B. which Dr. Felo reviewed prior to trial.

{¶118} The cause of Paul B.'s death was determined to be "[b]lunt impact to head with brain injuries." Other conditions that contributed to the death were "[c]onflagration injury [flame burns] with thermal injuries and asphyxia by carbon monoxide." Dr. Felo described that the blunt injuries to Paul's head were severe, but are not always fatal. He described that the burns and asphyxia are not always fatal either. But "putting the two together, they're fatal." He summarized that the "blows to the head and the brain injuries" were the primary cause of Paul's death "[a]nd what pushed him over the edge and finally caused his death is the burns and the carbon monoxide poisoning." The autopsy revealed that Paul was alive during the fire as he had breathed in smoke from the fire before death.

{¶119} The cause of P.B.'s death was determined to be "[g]unshot wounds of the head with skull and brain injuries." Specifically, the autopsy revealed that P.B. had been shot three times in the head and died before the fire started.

### 16. The Examination of Annette Kennedy

{¶120} Annettee Kennedy testified that she owns a used car lot in Cleveland called J&W Auto.

{¶121} Newberry was a customer of J&W Auto and had purchased "a couple cars" from the business. On September 21, 2018, Newberry bought a navy blue Ford Edge. He asked that the car be registered in his mother's name. Around three weeks later, Newberry returned the car because—he said—the radio was not working properly and "he just didn't want the car[;] [h]e wanted to be put into something else." Newberry had tinted the vehicle's windows, so he was told he would have to remove the tint before returning the car. Newberry had that work completed by the next day. Newberry purchased a light maroon Sonata on October 26, 2018, the same day Newberry turned in the Ford Edge; the car was also placed in his mother's name.

### 17. The Motions to Suppress Evidence and Dismiss the Indictment

{¶122} During trial, outside the presence of the jury, the defense moved to suppress a recording investigators had made of an interview they conducted with Newberry. The defense related that Newberry was represented by a lawyer who was present at the interview. At the end of the recorded interview, the lawyer asked the detectives to turn off the recording. The detectives responded, "Give us five seconds" and left the room, leaving Newberry alone with counsel. The detectives did not turn off the recording equipment, which captured attorney–client communications between Newberry and his counsel.

28

{¶123} The defense argued that the recording should be suppressed and the indictment dismissed for what the defense viewed as an intentional violation of the attorney–client privilege.

{¶124} The trial court denied the motion to suppress and the motion to dismiss the indictment. It ordered that the portion of the recording containing the attorney–client communications be excluded from the exhibit that would be shown to the jury.

## 18. The Examination of Kenneth Lundy

{¶125} Kenneth Lundy testified that he is employed as a police captain with the East Cleveland Police Department but was a detective with the department in the fall of 2018.

{¶126} Lundy was assigned to the investigation of Paul's and P.B.'s deaths. In speaking with the victims' relatives, Lundy came to learn that two Playstation consoles, designer belts, watches and shoes had been stolen from the Gould Avenue residence, as were a "Louis Vuitton hat[ ] and a black and red JACK'S Casino duffle bag."

{¶127} Investigators received a tip that a "dark colored SUV" drove slowly past Paul B.'s Gould Avenue house at around 3 a.m. on October 10, 2018. The security camera at Harris' home later recorded Paul B.'s Buick LaCrosse driving in East Cleveland, followed closely by a dark-colored Ford Edge with a temporary tag. Investigators came to learn that Newberry had bought and returned a blue 2010 Ford Edge to J&W Auto; they towed the car from the lot to process it for evidence.

{¶128} Lundy interviewed Newberry on November 9, 2018. The state played the recording of the interview, during which Newberry claimed that a "Jamaican Shawn" had his car at the time of the murders.

{¶129} After making investigation, Lundy found that there was no merit "to the identification of Jamaican Shawn."

{¶130} Phone records showed that Gibson and Newberry were communicating by phone on October 9 and in "the early morning hours" of October 10, 2018. For instance, by comparing the time stamp on the gas station's surveillance recordings with the phone records, Lundy saw that Gibson's phone number was connected to Newberry's phone number in a call at around 8:31 a.m. on October 10 while Gibson was at the gas station holding the gas can Gilbert had brought him.

{¶131} The records also showed that Gibson's and Newberry's cell phones were "hitting off the same tower, so they're in the same area" at around 8:56 a.m. that morning.

{¶132} The records also showed that there were over 60 calls between Gibson and Gilbert in the "late night hours of October 9th into the early morning hours of October 10th * * *." Of those, 45 calls occurred between 4:20 a.m. and 5:30 a.m. on October 10.

{¶133} The records also showed that Newberry's phone number and Gibson's phone number were communicating on October 10 with a phone number associated with a Darriel Ray, whose grandmother owned the house next to the vacant lot where Paul's and P.B.'s bodies were found. Gibson's and Newberry's phone numbers were also communicating on October 10 with a phone number associated with an Antonio Bell, whose mother owned the "dump site" house on Wadena Avenue where investigators believe Paul and P.B. were taken before their deaths.

{¶134} The phone numbers associated with DeMarcus Sheeley and Quentin Palmer were also in contact with the phone numbers of Gibson and Newberry on October 9 and October 10.

{¶135} On cross-examination, Lundy admitted that Newberry voluntarily came to the East Cleveland Police Department on November 9, 2018, to turn himself in after police made it known that they wanted to talk to him as a person of interest.

{¶136} Lundy admitted that, in the interview, Newberry said he last saw his car at "one or two in the morning," which would have been after Newberry was seen with the car at the gas station. Lundy further admitted that Newberry exits his own car from the back seat in the camera footage; in the entire case, there are no photographs of Newberry driving his car. Lundy further admitted that Newberry said he did not get his car and cell phone back until "somewhere before 12." Lundy admitted that Newberry does not appear on any of the gas-station security footage from later in the morning of October 10. He further admitted that he had previously identified—under oath—one of the people in those recordings as Newberry, but he had been mistaken.

{¶137} Lundy admitted that the burglary in Bedford could have occurred between 3 a.m. and 7 a.m. on October 10; it was not known when the gasoline was poured in the house and there was no video footage of whoever poured it in there.

{¶138} Lundy admitted that Newberry told investigators he did not have his cell phone during the relevant time period on October 10. No one saw Newberry talking on his phone during that time.

{¶139} He admitted that, while the FBI told him the phones used the same tower, he cannot tell how close those two phones were to each other.

{¶140} He admitted that no items identified as stolen from Paul B.'s Bedford home were found in Newberry's possession.

31

{¶141} Lundy admitted that law enforcement asked Newberry about "Jamaican Shawn" first, based on information they had obtained from someone else; Newberry did not volunteer that name to them. On redirect, Lundy said the first person to mention "Jamaican Shawn" to them was Newberry's mother.

### D. The Motion for Acquittal and the Defense Case

{¶142} After the close of the state's case, Newberry moved for acquittal on all the charges pursuant to Crim.R. 29. The trial court denied the motion.

{¶143} The defense did not present a case. It renewed the motion for acquittal at the close of trial and the trial court denied the renewed motion.

### E. The Verdict

{¶144} On March 16, 2022, the jury returned its verdict. The jury found Newberry guilty on all counts with their attached specifications, except that it found that the state had not proven the firearm specifications attached to Counts 2, 5, 6 and 7. The trial court then took Count 15, which was tried to the bench, under consideration. The trial court found Newberry guilty of Count 15.

*Newberry,* 2023 WL 6475159, at *2–16.

## Procedural background

*Sentencing*

In March 2022, the trial court merged as to each victim the felonious assault, murder, aggravated arson, and aggravated murder counts, and for each victim sentenced Newberry to consecutive life-in-prison terms with the possibility of parole after 30 years. Doc. 20-1, at 57 (Exhibit 15). The court sentenced Newberry to five additional years on the remaining counts, for an aggregate sentence of 65 years to life in prison. *Id.*

32

*Direct appeal*

In April 2022, Newberry, through new appointed counsel, appealed to the Ohio court of appeals. Doc. 20-1, at 60 (Exhibit 16). About two months later, Newberry retained attorney Kimberly Kendall Corral, who then entered a notice of appearance. *Id.* at 946 (Exhibit 45). The day that Newberry's appellate brief was due, Corral moved to withdraw from the case due to a conflict of interest. *Id.* at 74–76 (Exhibit 17). Then attorney Katerina MacGregor, an attorney in Corral's law firm, filed a notice of appearance on Newberry's behalf, *id.* at 946 (Exhibit 45), and a motion to supplement the record, instanter, on Newberry's behalf, *id.* at 79 (Exhibit 18). The court granted Corral's motion to withdraw as counsel, and denied Newberry's motion to supplement the record because it contained evidence outside the trial-court record. *Id.* at 105–06 (Exhibits 19 & 20). In his merits brief, Newberry raised the following assignments of error:[2]

> 1. The trial court erred by not removing juror 31 for cause
>> A. trial counsel was ineffective for failing to challenge juror 31 for cause
>
> 2. The trial court erred by admitting the appellants recorded interview where law enforcement improperly recorded appellant's privileged meeting with counsel
>
> 3. The trial court erred when it overruled appellant's motion for a mistrial

---

[2]    In this report and recommendation, I have reproduced Newberry's grounds for relief are reproduced as written, other than that I have eliminated the all-caps for easier reading.

4. Appellant was denied the effective assistance of counsel in violation of his in violation of the Sixth Amendment to the United States Constitution

    A. Counsel's failure to object, raise a Daubert challenge, to the scientific cell phone location data denied appellant effective assistance of counsel

    B. Appellant's counsel was ineffective for failing to object to the admission of cell phone records which had not been properly authenticated

5. The admission of testimony as to the content of unauthenticated records is plain error in violation of Appellant's Fifth, Sixth, and Fourteenth Amendments rights

6. The trial court erred when it admitted heresay evidence in violation of appellant's Confrontation rights

7. Improper identification testimony of police detective's, identifying appellant as the person in a gas station surveillance video invaded the providence of the jury in violation of appellant's rights

    A. Trial counsel was ineffective for failing to contemporaneously object to improper identification

    B. the trial court abused its discretion in admitting testimony which the trial court determined to be an improper identification

    C. The prosecution engaged in misconduct it solicited identification after agreement that such identification was improper and "that mistake won't happen again."

34

8. The trial court failed to inquire into the nature and extent of a conflict of interest arising out of appellant counsels representation of the lead police investigator

9. The trial court abused its discretion when it failed to disqualify defense counsel absent a knowing intelligent and voluntary waiver

10. Appellants convictions are against the manifest weight of evidence

11. The state failed to present sufficient evidence to prove each and every element of the offenses beyond reasonable doubt

12. The cumultive effect of multiple error deprived appellant of his constituitonall guarunteed right to a fair trial under the federal and state constituion

Doc. 20-1, at 112–13 (Exhibit 21). On October 5, 2023, the Ohio court of appeals affirmed the trial court's judgment. *Id*. at 210–73 (Exhibit 23).

Newberry, through retained counsel Gabrielle Ploplis, also from Corral's law firm, appealed to the Ohio Supreme Court. Doc. 20-1, at 274. In his memorandum in support of jurisdiction, Newberry set forth the same propositions of law as he raised in his direct appeal. Doc. 20-1, at 277–78 (Exhibit 25). On February 6, 2024, the Ohio Supreme Court declined under its rule of practice 7.08(B)(4) to accept jurisdiction of Newberry's appeal. *Id*. at 314 (Exhibit 27).

*Petition for post-conviction relief*

On June 23, 2023, while his direct appeal was pending, Newberry, through attorney Ploplis, filed in the trial court a petition to vacate or set aside

35

judgment, and requested an evidentiary hearing. Doc. 20-1, at 316 (Exhibit 28). In his petition, Newberry claimed that he received ineffective assistance of counsel and raised the following three issues:

> 1. Ronald Newberry is entitled to an evidentiary hearing and subsequent new trial as his trial counsel's former representation of East Cleveland Detective Joseph Marche presented an unwaivable conflict in violation of Newberry's constitutional rights.

> 2. Defense Kevin Spellacy was ineffective for failing to impeach Detective Lundy with respect to information obtained as to his integrity as an East Cleveland Police Detective.

> 3. Newly discovered evidence reveals that the State failed to disclose <u>Brady</u> material as to the training and certification of Detective Kenneth Lundy.

*Id*. at 324–30.

In June 2023, Newberry filed a motion to supplement the petition for post-conviction relief with numerous exhibits. *Id*. at 338 (Exhibit 29). The State filed a brief in opposition to Newberry's post-conviction petition. *Id*. at 515 (Exhibit 30). In November 2023, Newberry moved to supplement his petition with newly discovered evidence. *Id*. at 731 (Exhibit 31). He submitted an affidavit of co-defendant Demarcus Sheeley, in which, Newberry says, Sheeley "exculpate[s] [Newberry] from guilt in the murder, kidnapping and burglary" of Paul B. and P.B. *Id*. The State moved to strike Newberry's supplement or, alternatively, urged the trial court to deny Newberry's motion to supplement. *Id*. at 739 (Exhibit 32). In December 2023, Newberry filed another motion for

36

leave to supplement his petition. *Id*. at 750 (Exhibit 33). He again submitted Sheeley's affidavit. *Id*. The State opposed Newberry's motion. *Id*. at 758 (Exhibit 34). On March 25, 2024, the trial court denied Newberry's November and December 2023 motions to supplement; granted his June 2023 motion to supplement; and issued findings of fact and conclusions of law denying without a hearing Newberry's postconviction petition. *Id*. at 774, 784–834 (Exhibit 35 & 36).

Newberry appealed to the Ohio court of appeals. Doc. 20-1, at 775 (Exhibit 36). In his brief, he raised the following nine assignments of error:

> 1. The trial court erred in failing to hold an evidentiary hearing on appellant's postconviction petition.
>
> 2. The trial court erred in denying appellant's postconviction petition.
>
> 3. The trial court erred in finding that appellant's claims were barred by res judicata.
>
> 4. The trial court erred in finding that representation of Commander Marche by appellant's trial counsel did not amount to an actual conflict.
>
> 5. The trial court erred in finding that the impeachment of Marche would have been improper.
>
> 6. The trial court erred in fnding that appellant failed to establish that he did not satisfy the Strickland ineffectiveness standard.
>
> 7. The trial court erred in finding that appellant failed to demonstrate a Brady/Giglio violation.

> A. The new evidence was both favorable and material.
>
> B. The new evidence was known by the state and undisclosed to the defense.
>
> 8. The trial court erred in providing that appellant did not meet the Brady standard because the information was publicly available
>
> 9. The trial court erred in considering admissibility is assessing appellant's Brady/Giglio claim.

*Id.* at 841 (Exhibit 37). In January 2025, Newberry filed a notice of supplemental authority. *Id.* at 912 (Exhibit 41). On June 5, 2025, the Ohio court of appeals affirmed the trial court's denial of Newberry's postconviction petition. *See State v. Newberry*, Ohio 8th Dist. App. No. 113844, 2025 WL 1588498 (Ohio Ct. App. June 5, 2025).

Newberry did not appeal to the Ohio Supreme Court.

*Federal habeas corpus petition*

On February 5, 2025, Newberry, through Attorney Corral, filed his federal habeas corpus petition under 28 U.S.C. § 2254, raising twelve grounds for relief. Doc. 1. Respondent filed a notice of a potential conflict of interest of counsel Corral, Doc. 8, and attorney Ploplis entered a notice substituting herself for Corral, Doc. 10. Respondent raised concerns that Corral's conflict was imputed to Ploplis. Doc. 11. The parties filed responsive briefs and the Court held a hearing. Doc. 16. After the hearing, Ploplis filed a Notice of Waivers of Conflict. Doc. 17.

On August 25, 2025, Newberry filed an Amended Petition, in which he raises the following grounds for relief:

**Ground one**: Trial court erred in failing to remove juror for cause, and trial counsel was ineffective for failure to challenge the juror for cause.

*Supporting facts*: During voir dire, juror 31 disclosed that his daughter was friends with the victim's daughter. Although the juror indicated that he had not had contact with his daughter for four years, that timeline placed the juror's last communication with the daughter right at the time the murder occurred. The murder had occurred four years before the trial was held.

**Ground two**: The trial court erred by permitting introduction of portions of Newberry's recorded interview, where police improperly obtained such portions through recorded privileged meeting with his counsel.

*Supporting facts*: The prosecution introduced portions of a recorded statement that Newberry made while with his attorney at the East Cleveland Police Department. The video introduced originally contained 11 minutes of footage of a privileged communication between Newberry and his defense attorney. His attorney had explicitly instructed officers to discontinue recording for the duration of their privileged communication, yet the police secretly continued to record. The trial court permitted the prosecution to utilize the unprivileged portions of the video, and therefore, the state able to benefit from the infingement.

**Ground three**: Trial court error in overruling Newberry's motion for a mistrial.

*Supporting facts*: During examination of former East Cleveland Detective Lundy, the prosecution inquired into whether Newberry had ever provided a list of alibi witnesses. This question

related to the interview conducted with Newberry and his attorney at East Cleveland Police Department (referenced in Ground Two). Newberry's counsel offered to provide a list of alibi witnesses but no list was ever furnished.

**Ground four**: Ineffective assistance of counsel in violation of the Sixth Amendment for failing to raise a Daubert challenge and failing to object to admission of unauthenticated cell phone records.

*Supporting facts*: The prosecution offered scientific testimony of cellcite location data, through a witness who claimed to have specialized training to analyze the data and create a report which consisted of mapping of the user's locations. The training referred to was 10 weeks of CAST. No testimony as to procedures used was introduced. There was no testimony as to source data, or what data each phone company provided. No testimony of how the records are produced by the company, who is responsible for production of records, coverage area of the tower was provided. The data is simply ented into a software system which determines path of travel. Record-keeping information is also highly relevant to admissibility assessment. No testimony authenticating such records was provided.

**Ground five**: The admission of testimony as to the content of unauthenticated records in violation of the Fifth, Sixth and Fourteenth Amendments.

*Supporting facts*: The cell phone records used to create map imaging of Newberry's alleged location on the night of the homicides were admitted without proper authentication from a qualified witness, nor any authenticating documentation.

**Ground six**: The trial court erred by admitting hearsay evidence in violation of the Confrontation Clause.

*Supporting facts*: Quiana Gilbert, testified on behalf of the state that she "understood" her

boyfriend to have been with Newberry the night of the homicide. The basis of this understanding was the co-defendant's cellphone communications with her that night.

**Ground seven**: Former East Cleveland Detective Lundy improperly identified Newberry in a gas station video, which invaded the providence of the jury in violation of Due Process protections, trial court erred in permitting such testimony, trial counsel was ineffective for failing to object to the testimony which violated the Sixth Amendment, and the state engaged in misconduct for soliciting the improper identification.

*Supporting facts*: Detective Lundy repeatedly identified Newberry as the person shown in a grainy gas station video. The identification had already been deemed improper previously and was addressed amongst the parties prior to Detective Lundy's testimony. The state elicited such testimony even though it had stated on the record that the former identification in the co-defendant's trial was improper and was a mistake that "wouldn't happen again", counsel did not contemporaneously object to the improper testimony, and trial court allowed the identification despite acknowledging that the identification was improper.

**Ground eight**: The trial court failed to inquire into the nature and extent of a conflict of interest arising out of appellant counsel's representation of the lead police investigator.

*Supporting facts*: Prior to trial, Newberry's trial counsel had simultaneously represented the lead detective, Marche, who sat at the prosecution table and had led the investigation against him. The detective was not called as a witness by either side. The conflict was addressed on the record to which defense counsel provided vague details as to the prior representation of the detective. The trial court did not ask additional questions about the representation.

41

**Ground nine**: The trial court abused its discretion when it failed to disqualify defense counsel absent a knowing, voluntary, intelligent waiver which violated Due Process and Sixth Amendment rights to unconflicted representation.

*Supporting facts*: Following vague disclosure of the conflict the trial court asked Newberry if he is "ok" with what he had just heard. Newberry replied in the affirmative without any discussion as to the ramifications of such a waiver, no discussion to ensure Newberry's full understanding of the disclosure, and the nature of the conflict and how such could limit his counsel's representation of him at trial.

**Ground ten**: The state failed to present sufficient evidence to prove each and every element of the offenses beyond reasonable doubt.

*Supporting facts*: All of the evidence presented against Newberry was circumstantial and lacking reliability. The evidence included unreliable and unauthenticated cell cite location data, hearsay testimony, and conflicting accounts lacking credibility. Additionally, surveillance footage confirmed that Newberry was not in fact at the gas station with the suspected co-defendants despite the improper identification by Detective Lundy. The entirety of the state's case against Newberry was that his car was used to facilitate the homicides. However, evidence showed that his vehicle was present at a gas station without him. No evidence introduced by the state established Newberry's presence at the suspected location of the homicide, nor was any evidence introduced to suggest that Newberry participated in said homicides.

Doc. 19, at 6–11; Doc. 19-1. The Warden filed a Return of Writ, Doc. 20,

Newberry filed a traverse, Doc. 23, and the Warden filed a reply, Doc. 24.

42

**Legal Standard**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104–132, 110 Stat. 1214, petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when state court remedies are no longer available, procedural default rather than exhaustion applies. *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b),(c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have

jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts") (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). And a habeas petitioner must present both the factual and legal underpinnings of the claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the "petitioner must present his claim to the state courts as a federal constitutional issue— not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id*. In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: whether (1) there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) the state court enforced the procedural rule; (3) the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal

constitutional claim; and (4) the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 847). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806.

To overcome a procedural bar, petitioners must show cause for the default and actual prejudice that resulted from the alleged violation of federal law that forms the basis of their challenge, or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218, 231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must then show that state's court's adjudication "was *contrary to*," or "involved an *unreasonable application* of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1) (emphasis added); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A]n 'unreasonable application

46

of'" the Court's holdings is one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law' refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting *White*, 572 U.S. at 419). A state court is not required to cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*,

562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Discussion**

**A portion of ground one fails on the merits and the remainder is procedurally defaulted.**

Ground one has two parts: Newberry argues that (1) the trial court erred when it failed to remove Juror 31 for cause, and (2) trial counsel was ineffective for failing to challenge Juror 31. Doc. 19, at 6. The basis for these arguments is the fact that during voir dire, Juror 31 "disclosed that his daughter was friends with the victim's daughter." *Id.*

*Newberry has procedurally defaulted his trial-court error claim*

Respondent argues that Newberry's trial-court error claim is procedurally defaulted. Doc. 20, at 41. In his traverse, Newberry does not address this issue.

Newberry raised this claim to the Ohio court of appeals on direct appeal. The Ohio court of appeals applied plain-error review to this claim "[b]ecause Newberry did not challenge juror No. 31 for cause during voir dire." *Newberry*, 2023 WL 6475159, at *16. Ohio's long-standing contemporaneous objection rule requires a party to make a contemporaneous objection to an alleged trial

48

error to preserve the error for appellate review. *See, e.g., State v. Murphy*, 747 N.E.2d 765, 788 (Ohio 2001). When an Ohio court applies plain error review, it enforces an independent and adequate state ground that precludes federal habeas review. *Scott v. Mitchell*, 209 F.3d 854, 866–71 (6th Cir. 2000). And the state court's plain error review "does not constitute a waiver of the state's procedural default rules and resurrect the issue." *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012) (quoting *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006)). Because the Ohio court of appeals applied plain error review to Newberry's claim that the trial court erred with respect to Juror 31, this claim is procedurally defaulted. Newberry has not alleged cause, prejudice, or actual innocence to excuse the procedural default.

*Newberry's ineffective-assistance claim fails on the merits*

Newberry's claim that trial counsel was ineffective for failing to object to Juror 31 fails on the merits.

A successful ineffective-assistance claim requires a petitioner to demonstrate that: (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Jones v. Bradshaw*, 46 F.4th 459, 487–88 (6th Cir. 2022) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "The first prong is satisfied when a petitioner 'show[s] that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Jones*, 46 F.4th at 487 (quoting *Strickland*, 466 U.S. at 694). "The second prong is satisfied when the

49

petitioner 'show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones*, 46 F.4th at 487–88. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jones*, 46 F.4th at 488 (quoting *Strickland*, 466 U.S. at 694). The combined effect of *Strickland* and 28 U.S.C. § 2254(d) is "'doubly deferential'" review. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "When 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105; *Foust v. Houk*, 655 F.3d 524, 533–34 (6th Cir. 2011). "Or, in more concrete terms, a federal court may grant relief only if *every* "'fairminded juris[t]'" would agree that *every* reasonable lawyer would have made a different decision." *Dunn v. Reeves*, 594 U.S. 731, 739–40 (2021) (quoting *Harrington*, 562 U.S. at 101).

The Ohio court of appeals determined that Newberry failed to show that the trial court committed plain error by permitting Juror 31 to be seated on the jury:

> {¶151} Newberry has not demonstrated plain error. His argument seems to be premised on a presumption that is not supported by the record—that juror No. 31's daughter was friends with P.B., one of the victims. This is far from certain. Jennifer Heard testified that Paul had other children, including other daughters. The court read the indictment to the venire before voir dire began, so juror No. 31 knew that P.B. was one of the victims in the case. If the juror's daughter had been friends

50

with P.B., one can presume that he would have said as much. The juror's use of the present tense "is friends" (as opposed to "was friends") and reference to "the victim's daughter" (as opposed to "one of the victims") strongly suggests that the juror's daughter is friends with another of Paul's children. But in any event, the juror reported that his daughter's friendship with one of Paul's children would not affect the juror's ability to be fair and impartial. Based upon a review of the entire voir dire, we see no obvious error in the trial court seating juror No. 31 on the jury.

*Newberry*, 2023 WL 6475159, at *17. The court then considered and rejected

Newberry's related ineffective-assistance-of-counsel claim:

{¶153} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *See id.* at 687, 104 S.Ct. 2052.

{¶154} In evaluating counsel's performance on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689, 466 U.S. 668, 686, 104 S.Ct. 2052; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Powlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

51

{¶155} As it relates to counsel's performance in voir dire, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001). Newberry must demonstrate that counsel's performance was objectively unreasonable in light of counsel's failure to further question or strike the juror at issue. *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 25. To establish prejudice, Newberry "'must show that [a] juror was actually biased against him.'" (Emphasis omitted; alteration in original.) *Id.*, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67.

{¶156} There is no indication that juror No. 31 was biased against Newberry. We do not view it as objectively unreasonable that counsel did not question the juror further or move to strike the juror. The fact that the juror's daughter is friends with one of the victim's children is not, standing alone, one of the enumerated bases upon which a juror may be challenged for cause under R.C. 2313.17. Moreover, the juror reported that he had not spoken with his daughter for years prior to trial. Finally, the juror stated under oath that the relationship would not affect his ability to be fair and impartial in the matter. Under the facts and circumstances of this case, we do not find that Newberry's counsel was ineffective with respect to the seating of juror No. 31 on the jury.

*Newberry*, 2023 WL 6475159, at *17–18.

Newberry argues that although Juror 31 "indicated that he had not had contact with his daughter for four years, that timeline placed the juror's last communication with the daughter" four years before trial, "right at the time the murder occurred." Doc. 19, at 6. "Since his daughter and the victim's daughter were friends," Newberry submits, "there is a substantial risk that

Juror 31 either had information relevant to the homicide disclosed to him by his daughter" or that "the closeness of the connection impacted his ability to be fair." Doc. 23, at 6.

Newberry's argument rests on a premise not supported by the record—that Juror 31's daughter was friends with the victim's daughter *at the time of the murder*. The transcript shows otherwise. Juror 31 explained that "[i]t's also believed that my daughter, who I haven't spoke[n] to for years, is friends with the victim's daughter…. I don't know who she is or I have no contact with the victims." Doc. 23, at 60. Juror 31's *belief* that his daughter *is* friends with the victim's daughter is consistent with his statement that he hasn't spoken to his daughter in years, and that he has learned of his daughter's believed friendship by some other means. Newberry's assumption—that at the time of the murder, Juror 31 was in contact with his daughter who was friends with the victim's daughter—is just that—an assumption unsupported by anything. In any event, "[t]he Constitution does not require ignorant or uninformed jurors; it requires impartial jurors. While it may be sound trial strategy for an attorney to exclude anyone with knowledge of the facts or the parties, such a result is not mandated by the Constitution." *McQueen v. Scroggy*, 99 F.3d 1302, 1320 (6th Cir. 1996), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *in turn vacated by Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005).

53

Newberry retorts that "federal courts have consistently held that implied or presumed bias exists when a juror has a close relationship to a principal in the trial, such as a victim or the victim's family, and that such bias requires the juror's removal for cause." Doc. 23, at 7. Even if what Newberry says about the law is true, the transcript does not show that Juror 31 had a "close relationship to a principal in the trial, such as a victim or the victim's family." Nor was Juror 31 "a close relative to a party, victim, or other principal in the case," as Newberry contends. *Id.* Simply put, Newberry has not established an "implied bias" of Juror 31. As his ineffective-assistance-of-counsel claim rests on such a finding, his claim necessarily fails on the merits.

### Ground two fails on the merits

In ground two, Newberry argues that the trial court erred "by permitting introduction of portions of Newberry's recorded interview, where police improperly obtained such portions through recorded privileged meeting with his counsel." Doc. 19, at 8. Newberry explains that his conversation with counsel took place at the end of his police interview at the station, as the police were leaving the room before returning with a swab to take Newberry's DNA sample. *Id.*; *see* Doc. 20-8, at 74, 76 (transcript). Newberry states that his attorney "explicitly instructed officers to discontinue recording," but the police "secretly continued to record" a subsequent 11-minute private conversation Newberry had with his attorney. Doc. 19, at 8; *see* Doc. 20-8, at 74. The trial court permitted the State to use as evidence the police interview, minus the

54

11-minute conversation between Newberry and his attorney at the end of the recording. Doc. 20-8, at 83.

The Ohio court of appeals considered Newberry's claim that the trial court erred when it permitted the State to use the non-privileged part of the video as follows:

{¶157} Newberry contends that the trial court erred by admitting a video recording of an interview of Newberry with police investigators. The original recording captured Newberry consulting privately with defense counsel but the version the state offered at trial had that portion of the recording removed. Newberry argued that the fact that the state had recorded that conversation in the first place violated his Sixth Amendment rights and, therefore, the entire recording should have been excluded or the indictment dismissed. The trial court allowed the remainder of the recording—which, again, did not include the attorney–client conversation—to be admitted and played to the jury.

{¶158} "'Implicit within the meaning of [the constitutional right to counsel] is the right of a criminal defendant to consult privately with his attorney.'" (Alterations in original.) *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 131, quoting *State v. Milligan*, 40 Ohio St.3d 341, 342, 533 N.E.2d 724 (1988). But "'[e]ven where there is an intentional intrusion by the government into the attorney–client relationship, prejudice to the defendant must be shown before any remedy is granted.'" *Osie* at ¶ 144, quoting *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984).

{¶159} To determine prejudice, a court must look to the factors identified in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977): (1) whether the government deliberately intruded in order to obtain confidential and privileged information, (2) whether the government obtained

55

directly or indirectly any evidence which was or could be used at trial as a result of the intrusion, (3) whether any information obtained was or could be used in any manner detrimental to the defendant and (4) whether details about trial preparation were learned by the government. *Osie* at ¶ 144, citing *Milligan* at 344, 533 N.E.2d 724.

{¶160} Here, none of those four factors are present. We find, however, that it was an unconscionable violation of Newberry's constitutional rights. There is not, however, anything in the record that suggests the government obtained information that it used or could have used at trial or in another way detrimental to Newberry. Finally, there is nothing in the record suggesting that the government learned any details about defense trial preparation from the act.

{¶161} Therefore, the defense did not demonstrate that they were entitled to any remedy beyond that taken by the trial court, redacting the confidential conversation from the recording played at trial.

*Newberry*, 2023 WL 6475159, at *18.

In his traverse, Newberry argues that the Ohio court of appeals' "application of the *Weatherford* factors is unreasonable and unsupported by the record." Doc. 23, at 9. He asserts that the first factor, whether there was "purposeful intrusion," is met. *Id.* Even if it could be said that this factor was met,[3] Newberry hasn't shown that he has met the remaining three factors. He states that "the record demonstrates that such intrusion resulted in learning

---

[3]     In support of his argument, Newberry cites his attorney's statements to the trial court. Doc. 23, at 9 (citing Doc. 20-8, at 79).

of facts pertinent to the investigation—Petitioner Newberry's connection to the victim." *Id*. But he cites nothing to support this assertion.

Later in his brief, Newberry asserts that in the tape he discussed his relationship with the victim. *Id*. at 10; *see* Doc. 20-8, at 79–80. Newberry, however, did not make this argument to the Ohio court of appeals. *See* Doc. 20-1, at 120–21. In any event, Newberry doesn't say what about his relationship to the victim was revealed or how any such relationship was "pertinent to the investigation." Indeed, Newberry had at the time of his interview voluntarily come to the police station and the police took a DNA swab. *See Newberry*, 2023 WL 6475159, at *2. By then, the police had already learned of Newberry's potential involvement, suspected that Newberry's car had been used in the crime, and had confiscated the car from a used car lot. Doc. 20-8, at 104–13. Newberry concedes that "[t]he state linked Newberry to the murders of P.B. and Paul … by way of his vehicle." Doc. 19-2, at 2. And the DNA testing on a glove fragment found in the victim's home was a minor match to Newberry. *Newberry*, 2023 WL 6475159, at *9. So even if the police had learned from the private conversation information about an unspecified "relationship" that Newberry may have had to the victim, Newberry hasn't shown that the information "produced, directly or indirectly, any of the evidence offered at trial." *See Weatherford*, 429 U.S. at 552, 556.

Newberry hasn't shown that the Ohio court of appeals misapplied the *Weatherford* factors or that the court's factual findings were unreasonable. Ground two fails on the merits.

**Ground three fails on the merits**

In ground three, Newberry argues that the trial court erred when it denied his motion for a mistrial. Doc. 19, at 9. The basis for his motion for a mistrial was a reference to alibi witnesses. During Newberry's police interview, Newberry's counsel "offered to provide a list of alibi witnesses but no list was ever furnished." *Id*. At trial, the State, during its direct examination of Detective Lundy, asked whether Newberry had ever produced that alibi list and Lundy said no. *Id*.

The Ohio court of appeals considered Newberry's claim, and explained:

> {¶162} Newberry contends that the trial court erred by not ordering a mistrial during Lundy's testimony after the following exchange:
>
>> [PROSECUTING ATTORNEY]: During the interview [Newberry gave with police investigators], the defendant stated he was going to provide you with a list of names and alibi witnesses. * * * Was that ever provided?
>>
>> [LUNDY]: No.
>
> {¶163} Newberry says that this exchange implied that Newberry had an affirmative duty to provide a list of alibi witnesses to the police, undermining the presumption of innocence "and effectively reallocat[ing] the burden to the defense to disprove the State's case" in violation of the Fifth

58

Amendment.

{¶164} The decision to grant or deny a motion for mistrial lies within the sound discretion of the trial court. *State v. Taylor*, 8th Dist. Cuyahoga No. 111694, 2023-Ohio-928, ¶ 38; *State v. Miller*, 8th Dist. Cuyahoga No. 100461, 2014-Ohio-3907, ¶ 36, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 1995-Ohio-168, 656 N.E.2d 623 (1995). This is "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his [or her] courtroom warrants the declaration of a mistrial." *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988).

{¶165} A court abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *See, e.g., State v. Musleh*, 8th Dist. Cuyahoga No. 105305, 2017-Ohio-8166, ¶ 36, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "An abuse of discretion also occurs when a court '"applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact."'" *Cleveland v. Wanton*, 8th Dist. Cuyahoga No. 109828, 2021-Ohio-1951, ¶ 8, quoting *S. Euclid v. Datillo*, 2020-Ohio-4999, 160 N.E.3d 813, ¶ 8 (8th Dist.), quoting *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

{¶166} "'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * *.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 110883, 2022-Ohio-1940, ¶ 31, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 550 N.E.2d 490 (2d Dist.1988), paragraph two of the syllabus. A mistrial is warranted only when "'the ends of justice so require and a fair trial is no longer

possible.'" *Taylor* at ¶ 38, quoting *Garner* at 59, 656 N.E.2d 623.

{¶167} After a thorough review of the record, we conclude that the trial court acted within its discretion by denying Newberry's motion.

{¶168} "It is axiomatic that in a criminal prosecution, the prosecution bears the burden of proof in demonstrating that the accused is guilty beyond a reasonable doubt. Further, the prosecution may not shift to the accused the burden of proof on an essential element of the crime." (Citation omitted.) *State v. Porter*, 2016-Ohio-1115, 61 N.E.3d 589, ¶ 58 (8th Dist.), citing R.C. 2901.05(A) and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

{¶169} Here, though, the context of the state's question makes clear that the state was clarifying for the jury that it did not fail to investigate Newberry's explanation for his whereabouts on the date of the murders. The investigators were never provided the name of any witness to interview regarding Newberry's alibi. The state did not comment on Newberry's failure to produce alibi witnesses during closing argument.

{¶170} Moreover, the jury was instructed that the state bore the burden of proof and that the defense had no burden. A jury is presumed to follow the instructions, including curative instructions, given to it by a trial judge. *Garner* at 59, 656 N.E.2d 623.

{¶171} Given the context of the prosecutor's question and the instructions of the trial court clarifying that the state bore the burden of proof, we cannot say that the trial court abused its discretion in denying Newberry's motion for a mistrial.

*Newberry*, 2023 WL 6475159, at *18–20.

60

To start, the Ohio court of appeals applied the correct standard of review to Newberry's claim that the trial court erred in denying his motion for a mistrial. *See Illinois v. Somerville*, 410 U.S. 458, 462 (1973) ("The broad discretion reserved to the trial judge in [declaring a mistrial] has been consistently reiterated in decisions of this Court"). And on federal habeas review, "'[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) and citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Here, the Ohio court of appeals' consideration of whether the trial court exercised "sound discretion" when ruling on a motion for mistrial implicates a "general" rule. *See Lett*, 559 U.S. at 776; *Newberry*, 2023 WL 6475159, at *19. So the leeway given to the state court's determination is great. *Lett*, 559 U.S. at 776.

Newberry maintains that "the prosecution's questioning as to whether Petitioner had ever produced a list of alibi witnesses had the effect of insinuating that he had an obligation to produce such evidence or prove his innocence." Doc. 23, at 13. But he does not discuss the Ohio court of appeals' decision or describe why he believes that it was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

Newberry relies on an unpublished Sixth Circuit case, *United States v. Waters*, No. 95-6088, 96 F.3d 1449 (6th Cir. 1996) (unpublished), in support of his argument. *Id*. at 13–14. He argues that the court in *Waters* applied the four-factor test from *United States v. Drake*, 885 F.2d 323 (6th Cir. 1989), and asks this Court to apply the same four-factor test to the underlying facts in his case. *Id*.

*Water* and *Drake* were direct-appeal, Sixth Circuit cases. Neither of these cases therefore amount to Supreme Court precedent that this Court considers when evaluating under the deferential habeas standard of review the Ohio court of appeals' decision. In any event, Newberry cannot show that he satisfies the first *Drake* factor, whether the prosecutor's "comments 'manifestly intended' to reflect on [Newberry's] silence or [were] of such a character that the jury would 'naturally and necessarily' take them as such." *Drake*, 885 F.2d at 324. The Ohio court of appeals found that the state's question intended to address the police's efforts "to investigate Newberry's explanation for his whereabouts on the date of the murders." *Newberry*, 2023 WL 6475159, at *19. This is a reasonable reading of the record.[4] *See Lett*, 559 U.S. at 768 (the habeas

---

[4]     The video of Newberry's police interview was played for the jury. In the interview, Newberry said that a person called "Jamaican Shawn" had Newberry's car during the time of the murders. But *Jamaica Shawn* was a fictitious name. *See Newberry* 2023 WL 6475159, at *14. Discussed at length at trial in a side-bar were the fictitious nature of the name *Jamaican Shawn*, whether evidence to establish that the name was made-up (and who made it up) would be barred as hearsay, and how the State could show that the police had followed up on the *Jamaican Shawn* lead. *See* Doc. 20-8, at 128–47, 153.

court considers possible reasonable interpretations of the record, applying deference to the state court's interpretation). Also, relevant to the second *Drake* factor, the remark was isolated. 885 F.2d at 324. The trial court offered Newberry a curative instruction—which relates to another *Drake* factor, *id.* at 324—which counsel declined, Doc. 20-8, at 146. As for the remaining *Drake* factor, whether evidence of guilt was overwhelming, *id.* at 324, Newberry argues that the evidence was not overwhelming and "merely circumstantial," Doc. 23, at 14. But he has not shown that circumstantial evidence cannot amount to overwhelming evidence. *See, e.g., Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

Considering the deference due under AEDPA and the trial court's discretion in denying the motion for mistrial, Newberry has not shown that the Ohio court of appeal's finding implicates the standard in Section 2254(d).

**Ground four fails on the merits and ground five is procedurally defaulted**

In ground four, Newberry argues that trial counsel was ineffective for failing to raise a *Daubert*[5] challenge or to object to the admission of unauthenticated phone cell records. Doc. 19, at 11. In ground five, he alleges that "the admission of testimony as to the content of unauthenticated [cell phone] records" violated his Fifth, Sixth, and Fourteenth Amendment rights.

---

[5]     *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Doc. 19-1, at 1. The Ohio court of appeals considered these claims together as follows:

> {¶172} We consider Newberry's fourth and fifth assignments of error together because they are intertwined. Through them, Newberry challenges the admission into evidence of cell phone records containing location data for Newberry's and Gibson's cell phones. He contends that (1) the trial court erred by admitting the records because the records were not properly authenticated and (2) he was denied the effective assistance of counsel at trial because defense counsel did not object to the evidence on Daubert grounds and based on the lack of authentication.
>
> ## 1. The Cell Phone Records Were Authenticated
>
> {¶173} Because Newberry failed to object to the admission of the cell phone records at trial, he has forfeited all but plain error as to his authenticity argument.
>
> {¶174} Newberry contends that the records provided by the cell-phone companies were never authenticated or qualified as business records pursuant to Evid.R. 901 or 803(6). He argues that they should have been excluded, citing *State v. Brooks*, 5th Dist. Richland No. 2011-CA-59, 2012-Ohio-1725, and *State v. Hood*, 134 Ohio St.3d 595, 2012-Ohio-5559, 984 N.E.2d 929.[4] He says that the error was not harmless considering the circumstantial nature of the state's case.
>
> > [FN4] The Ohio Supreme Court vacated its decision in *State v. Hood*, 134 Ohio St.3d 595, 2012-Ohio-5559, 984 N.E.2d 929, and replaced it with a reconsidered opinion at *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057. Thus, we discuss the reconsidered opinion below.

{¶175} The state responds that the records were properly authenticated because Lundy testified that he received the records from T-Mobile in response to a search warrant and the records were accompanied by a statement from T-Mobile confirming that fact. The state directs us to *Chagrin Falls v. Ptak*, 8th Dist. Cuyahoga No. 109342, 2020-Ohio-5623; *State v. Richardson* 2016-Ohio-8081, 75 N.E.3d 831 (2d Dist.) and *Brecksville v. Sadaghiani*, 8th Dist. Cuyahoga No. 109992, 2021-Ohio-2443.

{¶176} Evid.R. 901(A) addresses the authentication or identification of evidence prior to its admissibility. Evid.R. 901(A) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This requirement is a "'a low threshold.'" *State v. Rogers*, 8th Dist. Cuyahoga No. 105879, 2018-Ohio-3495, ¶ 15, quoting *State v. Maust*, 8th Dist. Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 24. It "'does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be.'" *Rogers* at ¶ 15, quoting *Maust* at ¶ 24. The proponent of the evidence must demonstrate a "'reasonable likelihood' that the evidence is authentic, which may be supplied by the testimony of a witness with knowledge." *State v. Roseberry*, 197 Ohio App.3d 256, 268, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 65 (8th Dist.), quoting *State v. Bell*, 12th Dist. Clermont No. CA2008-05-044, 2009-Ohio-2335, ¶ 30; *State v. Wright*, Dist. Clermont No. 28831, 2021-Ohio-2133, at ¶ 77.

{¶177} In the context of a business record, a "'qualified witness' * * * would be someone with 'enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business.'" *Hood*, 135 Ohio St.3d 137 at ¶ 40, 984

65

N.E.2d 1057, quoting 5 McLaughlin, *Weinstein's Federal Evidence, Section,* 803.08[8][a] (2d Ed.2009).

{¶178} Here, Lundy testified that the cell-phone records were obtained directly from T-Mobile through a court-issued search warrant. The records were admitted into evidence along with a statement from T-Mobile that the records were being produced "in response to the Search Warrant * * * dated November 05, 2018."

{¶179} Moreover, the state presented the testimony of Jacob Kunkle, an FBI special agent who received specialized training in locating cell phones based on the records of cellular-communications providers. He is one of only approximately 80 special agents in the country on the FBI's Cellular Analysis Survey Team. To qualify for that specialized team, Kunkle underwent 400 hours of training with various cellular-communications providers, learning from the providers' records custodians and radio engineers. After that training, Kunkle passed a practical examination on the subject. He has performed thousands of location analyses in his career.

{¶180} Kunkle testified in detail about how communications providers record data about communications that occur from a particular cell phone, identifying the cell-phone tower and sector used. He explained how this data is used to locate a cell phone within an area as large as several square miles. He described the limitations of the technology, too, noting that a cell phone does not always select the closest tower when making a communication connection. He frankly admitted that the analysis was only "a piece to the puzzle" and that one cannot "precisely locate someone" using the providers' location data. He said the analysis "just gives you a general idea of where the phone was and whether it was in a particular area on a given date and time." Moreover, he admitted that he has "no knowledge of who possessed the phone on a given

date or time" and that the analysis does not identify the content of any communications.

{¶181} We find that Agent Kunkle is sufficiently familiar with the record-keeping system of T-Mobile to be a qualified witness for purposes of Evid.R. 803(6). *See State v. Johnson*, 2022-Ohio-4344, 203 N.E.3d 78, ¶ 104–108 (5th Dist.). This testimony, when combined with Lundy's testimony that the records were obtained from T-Mobile through a search warrant and the statement in the records confirming that the records were produced pursuant to the warrant, was sufficient to overcome the low threshold of authentication. *See Chagrin Falls v. Ptak*, 8th Dist. Cuyahoga No. 109342, 2020-Ohio-5623, ¶ 21.

## 2. Trial Counsel Was Not Ineffective

{¶182} "Failing to file a motion to suppress does not constitute ineffective assistance of counsel per se." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65. "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *Id*.

{¶183} Newberry contends that his defense counsel should have challenged the reliability of the cell phone records' location data pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). He further argues that his counsel should have objected to the records' admission because of a lack of foundation.

{¶184} In *Daubert*, the United States Supreme Court held that the trial court must act as a "gatekeeper" to ensure both the relevancy and reliability of expert scientific testimony before admitting it. The Ohio Supreme Court adopted the *Daubert* approach to determining the reliability of expert scientific testimony in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998).

67

{¶185} This court has previously held, however, that "testimony concerning a defendant's cell phone records and the location of the cellular towers used by a defendant's phone in relation to locations relevant to the crime constitutes lay opinion testimony that does not require 'specialized knowledge, skill, experience, training, or education' regarding cellular networks." *State v. Wilson*, 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980, ¶ 30, citing *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 69 (8th Dist.). We further noted that a *Daubert* analysis would be appropriate to the extent that a witness exceeded simply detailing the defendant's phone records and which cellular towers were used. *Wilson* at ¶ 31.

{¶186} Because Agent Kunkle only testified about the cell phone records of Gibson and Newberry and the location of the cellular towers used by their phones in relation to the locations relevant to the crimes, his testimony was admissible as lay testimony and Newberry has failed to demonstrate prejudice. We find that trial counsel's decision not to challenge the evidence was a tactical decision and the product of trial strategy. *See also State v. Sands*, 11th Dist. Lake No. 2007-L-003, 2008-Ohio-6981, ¶ 108 (noting that the decision to raise a *Daubert* challenge is a matter of trial strategy).

*Newberry*, 2023 WL 6475159, at *20–22.

*Ground four fails on the merits*

In support of his claim that trial counsel was ineffective for failing to raise a *Daubert* challenge, Newberry submits that "federal case law overwhelmingly supports the position that testimony involving complex scientific analysis of cell site data constitutes expert testimony subject to *Daubert* scrutiny," and that "such testimony is not admissible as lay opinion

testimony." Doc. 23, at 14. In support, Newberry relies on out-of-circuit federal cases and a state-court decision from Texas. *Id*. at 17–18.

Here, the question is whether trial counsel was ineffective for not raising a *Daubert* challenge. When evaluating counsel's performance, the court views the challenged "conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

As the Ohio court of appeals observed, it had held, years before Newberry's case, that testimony about cell phone records and the location of the cellular towers those phones used "is lay opinion testimony that does not require 'specialized knowledge, skill, experience, training, or education' regarding cellular networks." *State v. Daniel*, 57 N.E.3d 1203, 1218 (Ohio Ct. App. 2016); *see Newberry*, 2023 WL 6475159, at *22. Appellate courts in other districts in Ohio have come to the same conclusion. *See, e.g., State v. Baker*, 166 N.E.3d 601, 615 (Ohio Ct. App. 2020) (the Ohio Court of Appeals for the Seventh District following the reasoning in *Daniel* and explaining that appellate courts in the Fourth, Sixth, Eighth, and Eleventh Districts of Ohio had also done so or had previously arrived at the same conclusion). This is relevant because "[t]he failure to raise a meritless claim does not constitute ineffective assistance of counsel." *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020). Any *Daubert* challenge to the cell-phone location testimony at Newberry's trial therefore would have failed, based on the binding case law in

the Eighth District of Ohio. So counsel was not ineffective for not raising a
*Daubert* challenge. *See Tackett*, 956 F.3d at 375.

Newberry states that "the testimony in [his] case went beyond" what the
Ohio court of appeals had previously accepted as lay testimony. Doc. 23, at 18.
He asserts that "Kunkle testified that he could accurately determine direction
of travel of the phone." *Id*. (citing Doc 20-7, at 86). The transcript shows that
Kunkle testified that in a specified time period, the phone in question received
51 calls and indicated that it was in the Bedford area. Doc. 20-7, at 85–86.
When asked about the next two-hour period, Kunkle stated that the phone
"moved back to the North, … from the Maple Heights area where it used a
tower … up into the Cleveland area." *Id*. at 86. Newberry has not articulated
why Kunkle describing one tower as being "north" of another is problematic.
*See also Daniel*, 57 N.E.3d at 1218 (finding that a crime analyst's testimony
about the defendant's cell phone records and location of the cell towers it used
"in relation to other locations relevant to the crime," including a map the
analyst created showing these locations, was lay testimony not subject to a
*Daubert* analysis); *State v. Dunn*, No. 101648, 2015 WL 4656534, at *7 (Ohio
Ct. App. Aug. 6, 2015) ("Agent Braunschweiger testified about the map she
created plotting information she received about the cell tower information
appearing on the subpoenaed phone records….[A] layperson could compare the
locations depicted on the records to the corresponding location on the site
map.").

70

As for the cell-phone-records authentication question, Newberry contends that Ohio Rule of Evidence "803(6) requires authentication by a custodian or other qualified witness." Doc. 19-2, at 10. But he does not explain what he believes was unreasonable under Supreme Court precedent about the Ohio court of appeals' finding that the testimony of Kunkle and Lundy sufficiently authenticated these records.

In all, Newberry hasn't shown that "*every* "'fairminded juris[t]'" would agree that *every* reasonable lawyer would have made a different decision" than the one his trial counsel made. *See Dunn*, 594 U.S. at 739–40 (quoting *Harrington*, 562 U.S. at 101); *see Mays v. Hines*, 592 U.S. 385, 392 (2021) (put differently, "[a]ll that mattered was whether the *[state] court* … managed to blunder so badly that every fairminded jurist would disagree") (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Ground four fails on the merits.

*Ground five is procedurally defaulted*

Because Newberry's counsel did not object to the admission of the cell phone records at trial, the Ohio court of appeals applied plain-error review to Newberry's authentication claim. *Newberry*, 2023 WL 6475159, at *20. When it did, it applied Ohio's long-standing contemporaneous objection rule, which is an independent and adequate state ground that precludes federal habeas review. *See Scott*, 209 F.3d 854 at 871. Newberry has not alleged cause, prejudice, or actual innocence to excuse the procedural default. Ground five is procedurally defaulted.

**Ground six fails on the merits**

In ground six, Newberry raises a Confrontation Clause claim. Doc. 19-1, at 1. He submits that he right to confrontation was violated when state witness "Quiana Gilbert testified that she 'understood' her boyfriend to have been with Newberry the night of the homicide" based on her phone communication with Gibson. *Id.* The Ohio court of appeals rejected Newberry's claim, as follows:

> {¶187} Newberry contends that the trial court erred in admitting, over objection, Quiana Gilbert's statement that it was her understanding that Gibson was with Newberry overnight on the night of the murders.

> {¶188} The Sixth Amendment to the U.S. Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against [the accused]." The United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

> {¶189} Here, though, there is no out-of-court testimonial statement. Quiana Gilbert testified that it was her understanding that Gibson was with Newberry throughout the night of the crimes. It was established that Gilbert was communicating with Gibson over the phone that night. But the state did not elicit testimony from Gilbert that Gibson told her that he was with Newberry.

> {¶190} Because Gilbert did not testify about what Gibson told her on the phone that evening, there is no out-of-court statement that could be considered hearsay and there is no Confrontation Clause issue.

*Newberry*, 2023 WL 6475159, at *22.

Newberry maintains that "admission of the statements of Petitioner's co-defendant through Gilbert were prejudicial resulting in a trial that was fundamentally unfair." Doc. 23, at 22. But he does not identify any "statements" made by his co-defendant that Gilbert testified about. He ignores the Ohio court of appeals' finding that Gilbert did not testify about any of Gibson's statements, and that, as a result, the Confrontation Clause is not implicated. Newberry has not shown that the Ohio court of appeals' finding was unreasonable under Supreme Court precedent. *See, e.g., Crawford v. Washington*, 541 U.S. 36, 68–69 (2004) ("Where *testimonial statements* are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.") (emphasis added).

### A portion of ground seven is not cognizable and procedurally defaulted, and the remainder fails on the merits

In ground seven, Newberry argues that Detective Lundy, who testified at trial, improperly identified Newberry from gas station surveillance video. Doc. 19-1, at 1. Newberry alleges that this error implicated the following constitutional violations: it "invaded the providence of the jury in violation of Due Process protections," the "trial court erred in permitting such testimony," "trial counsel was ineffective for failing to object to the testimony which violated the Sixth Amendment, and the state engaged in misconduct for

soliting the improper identification." *Id*. The Ohio court of appeals considered this claim as follows

> {¶191} Newberry contends that the trial court erred by admitting Captain Lundy's testimony identifying Newberry as one of the individuals captured by gas station security cameras on the night of the shooting. He further argues that his counsel was ineffective for failing to object to the identification testimony.

> {¶192} Lundy identified Newberry in security-camera footage captured between 12:41 a.m. and 12:48 a.m. on the day of the murders. Gilbert also identified Newberry in that footage.

> {¶193} In Gibson's trial, Lundy mistakenly identified Newberry in recordings captured later that morning. But, contrary to what Newberry suggests, Lundy did not make the same mistake in Newberry's trial. To the contrary, Lundy admitted that Newberry does not appear on any of the gas-station security footage from later in the morning of October 10. He further admitted that he had previously identified, under oath, one of the people in those recordings as Newberry, and that he had been mistaken.

> {¶194} Lundy was familiar with Newberry because he participated in Newberry's interview. Moreover, Gilbert also identified Newberry in the recordings.

> {¶195} There is no merit to Newberry's seventh assignment of error.

*Newberry*, 2023 WL 6475159, at *22–23.

Newberry has not disputed the Ohio court of appeals' finding that Lundy's misidentification of Newberry did not happen at Newberry's trial. *See also* Doc. 20-4, at 10, 13–15 (the parties' discussion with the trial court about

Lundy's misidentification of Newberry at Gibson's trial). So Newberry's claims that rely on Lundy's misidentification of him at Newberry's trial fail.

Next, Newberry alleges that Lundy at trial "improperly identified [Newberry] in a grainy gas station video" "without laying any proper foundation." Doc. 23, at 23. He contends that "Lundy's testimony lacked any indicia of contemporaneous familiarity with [Newberry], nor any unique or specialized ability to make a visual match." *Id*. Newberry argues that the Ohio court of appeals "improperly found that Lundy had prior familiarity with Newberry since he interviewed him prior to trial." *Id*. at 24.

"[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983); *see Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (a federal habeas court does not "reexamine state-court determinations on state-law questions," including the admissibility of evidence). "When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). To rise to the level of a due process violation, a state-court evidentiary ruling must "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996), in turn quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)).

Here, Newberry has not challenged the Ohio court of appeals' finding that Lundy "was familiar with Newberry because he participated in Newberry's interview." *Newberry*, 2023 WL 6475159, at *23. He has not shown that Lundy's identification of him in the gas station video "offend[s] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour*, 224 F.3d at 552; *see also United States v. Houston*, 813 F.3d 282, 287, 291–92 (6th Cir. 2016) (no error when the trial court permitted a special agent at trial to identify the defendant in a poor-quality video when the agent was familiar with the defendant because he had "personally observ[ed]" him). As for any ineffectiveness-of-counsel claim, even if it could be said that counsel was ineffective for failing to object, Newberry has not shown that he was prejudiced, since Gilbert also identified Newberry from the gas station video.

**Grounds eight and nine fail on the merits**

Grounds eight and nine involve an alleged conflict of interest involving Newberry's trial counsel.[6] In ground eight, Newberry argues that the trial court erred when it inquired into the nature and extent of counsel's alleged conflict, and in ground nine, Newberry alleges that the trial court "abused its discretion when it failed to disqualify defense counsel absent a knowing,

---

[6] Newberry's Amended Petition references "appellate" counsel, Doc. 19-1, at 1, but Newberry discusses his trial counsel's alleged conflict.

voluntary, intelligent waiver which violated Due Process and Sixth Amendment rights to unconflicted representation." Doc. 19-1, at 1–2.

For context, at trial the court and the parties discussed this issue one morning before trial:

> [Prosecutor]: Procedurally, Your Honor, I'm not sure how this would function but, we had discussed several times off the record with [defense counsel], his prior representation of Detective Marche and others in East Cleveland. I think it was a civil matter. I think it's advisable at this time that we go on the record and waive any potential conflicts. I'm just not sure where we landed on whose conflict that may be.
>
> [Defense counsel]: Well, Judge, I can—I don't even view it as a conflict. I mean, but be that as it may, I have represented in the past Mr. Marche, Detective Marche, now Commander Marche, right?
>
> Detective Marche: Yes, Sir.
>
> [Counsel]: And, like, three other East Cleveland folks. Personally, they were already represented by the law department, and it was a civil matter where somebody, a citizen, had brought an action again East Cleveland's police department for not being accredited, for not having their shooting records in line or qualifying records, not having their continuing education, things like that.
>
> The case was ultimately dismissed … I had actually filed a motion to withdraw before it got dismissed. In that representation, I think I talked to the chief of police once. I don't think I ever talked to Commander Marche about it. I just simply gathered records from BCI, and from the—from the police academy in Columbus and gave those to the Court, but that's it.

Nothing about this case or any other case, for that matter, was ever discussed. I've other cases against the Commander where I've cross-examined him. I have no problem doing my job in this case. I didn't learn anything from that representation about my client or any other client, for that matter. Thank you.

[Trial court]: Mr. Newberry, is that okay with you? After that's all been disclosed, are you okay?

[Newberry]: Yes.

[Trial court]: Okay. Anything further for the record?

[Prosecutor]: Not on behalf of State, Judge.

[Counsel]: No, thank you, Judge.

Doc. 20-4, at 15–17.

The Ohio court of appeals discussed Newberry's claims as follows:

{¶196} We address Newberry's eighth and ninth assignment of error together because they are intertwined. Through them, Newberry contends that one of his defense counsel had a conflict of interest based on counsel's former representation of [Detective] Marché and other East Cleveland law-enforcement officers. He asserts that his counsel should have been disqualified from representing him at trial.

{¶197} "The fundamental right to counsel includes a 'correlative right to representation free from conflicts of interest.'" *State v. Williams*, 166 Ohio St.3d 159, 2021-Ohio-3152, 184 N.E.3d 29, ¶ 6, quoting *State v. Gillard*, 64 Ohio St.3d 304, 311, 595 N.E.2d 878 (1992). "'Both defense counsel and the trial court are under an affirmative duty to ensure that a defendant's representation is conflict-free.'" *Williams* at ¶ 6, quoting *State v. Dillon*, 74 Ohio St.3d 166, 167–168, 1995-Ohio-169, 657 N.E.2d 273 (1995).

78

{¶198} Here, the nature of defense counsel's former representation of one of the state witnesses was fully disclosed, defense counsel stated that the former representation presented no conflict of interest and the trial court asked Newberry if he was comfortable proceeding to trial with that counsel. Newberry said that he was.

{¶199} Newberry has not shown that this consent was anything but informed and voluntary. Further, he has not shown that counsel's former representation presented an actual conflict of interest or that counsel's performance was adversely affected by the previous representation. *See Williams* at ¶ 8.

{¶200} Appellant's eighth and ninth assignments of error are without merit.

*Newberry*, 2023 WL 6475159, at *23.

Newberry objects to the Ohio court of appeals' finding that his trial counsel did not have an actual conflict. Doc. 23, at 27. He argues that there was an actual conflict because the "representation was pursuant to his official capacity as an employee of the East Cleveland Police Department, and the detective who led the investigation against Petitioner Newberry." Doc. 23, at 27. But Newberry doesn't explain how the fact that Marche was an East Cleveland employee has any bearing on the conflict analysis. He discusses *United States v. James*, 708 F.2d 40 (2nd Cir. 1983), Doc. 23, at 26, but that case is not on point. In *James*, a man called Barnes "was an organizer and boss of a large narcotics organization." 708 F.2d at 42. Barnes and co-defendants were convicted of numerous narcotics charges. *Id.* A few years later, James,

"[a] long-time and close associate[] of Barnes in the narcotics business," was also charged with violating numerous narcotics laws. *Id*. Barnes helped the government with the case against James and the government noticed its intent to call Barnes at James's trial. *Id*. Meanwhile, James was represented by attorneys who had worked with Barnes's attorney in his case and had represented Barnes's co-defendants. *Id*. The government and Barnes sought to disqualify the attorneys from representing James, and the district court granted the motion. *Id*. at 43. In affirming the trial court's ruling, the Second Circuit commented that Barnes objected to the representation, and that, furthermore:

> the findings that the present issues are substantially related to the subject matter of the past representation, and that defense counsel quite likely have received confidential information from the witness, together with the court's conclusion that the witness's interests cannot adequately be safeguarded by the court, have a serious impact on the interests of the government and of the public.

*James*, 708 F.2d at 45–46.

Here, the issues in Newberry's case were not "substantially related" to the civil case involving Marche. Marche did not object to the representation. Marche did not testify at Newberry's trial. And it was not "quite likely" that counsel had received confidential information from Marche; indeed, counsel said that when he represented the city's officers he had not spoken to Marche and that he "simply gathered" records and provided them to the court. Doc. 20-4, at 16. So none of the facts that the court relied on to disqualify the attorney

80

in *James* are present in this case. Moreover, *James* is not Supreme Court precedent. Newberry hasn't identified a Supreme Court case that the Ohio court of appeals ran afoul of.

In his Traverse, Newberry cites the records he obtained and submitted with his postconviction petition in support of his claim that his counsel's former representation of Marche amounted to an unwaivable conflict. Doc. 23, at 27; Doc. 20-1, at 324. But any related claim that Newberry raised in his postconviction petition is procedurally defaulted because Newberry didn't appeal the Ohio court of appeals' rejection of his claim to the Ohio Supreme Court. *See Williams*, 460 F.3d at 806 (a petitioner must raise a claim in state court "and pursue that claim through the state's 'ordinary appellate review procedures'"). Moreover, the Ohio court of appeals agreed with the trial court that Newberry's claim was barred by the doctrine of res judicata because Newberry could have, and did, raise the issue on direct appeal. *State v. Newberry*, 2025 WL 1588498, at *3–4 (Ohio Ct. App. June 5, 2025). This is a separate reason why Newberry's related claim that he raised in his postconviction petition is procedurally defaulted. *See Coleman v. Mitchell*, 268 F.3d 417, 427 (6th Cir. 2001) (claims raised in a post-conviction petition that the state court denies on the basis of res judicata are procedurally defaulted) (citing *State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967)). Newberry has not alleged cause, prejudice, or actual innocence to overcome the procedural default.

81

Next, Newberry argues that his waiver of the conflict was not knowing, voluntary, or intelligent. Doc. 19-1, at 2. He asserts that "[f]ederal case law overwhelmingly supports the position that a defendant's one-word affirmation following a vague disclosure of defense counsel's prior representation of a key investigator is insufficient to constitute a knowing and intelligent waiver of the right to conflict-free counsel." Doc. 23, at 28. But Newberry has not identified pertinent case law that supports his statement. He cites *United States v. Ross*, 33 F.3d 1507, 1522 (11th Cir. 1994), which, like *James*, involved attorneys and their firms representing different defendants who were charged with similar and related crimes in which one defendant testified at the other defendant's trial. Moreover, *Ross* does not represent a holding of the United States Supreme Court. Newberry complains that the trial court accepted his "one-word affirmation," Doc. 23, at 28, but doesn't say how many words he believes the court should have required. He characterizes his counsel's "vague disclosure … of prior representation," *id.*, but doesn't say what about counsel's explanation was vague. To the extent counsel's description of his participation in representing Detective Marche in a civil lawsuit could be considered "vague," this was due to the fact that counsel had very little to do with Marche's case, as he explained. Doc. 20-4, at 16–17.

Newberry has not shown that the Ohio court of appeals' decision on this issue was unreasonable.

**Ground ten fails on the merits**

In ground ten, Newberry argues that the State "failed to present sufficient evidence to prove each and every element of the offenses beyond reasonable doubt." Doc. 19-1, at 2.

When reviewing a claim that a petitioner's conviction is not supported by sufficient evidence, the court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Cavazos v. Smith*, 565 U.S. 1, 7 (2011). The court defers to the trier-of-fact's determination. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The standard is not whether the trier-of-fact made the correct guilt or innocence determination, but whether it made a rational decision to convict or acquit. *Herrera v. Collins*, 506 U.S. 390, 402 (1993). On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012). So even if this Court were to conclude that a rational trier-of-fact could not have found Newberry guilty beyond a reasonable doubt, the Court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

The Ohio court of appeals considered this claim, along with Newberry's manifest weight claim, as follows:

{¶201} We address Newberry's tenth and eleventh assignments of error together. Newberry contends that the state did not present sufficient evidence with respect to any count for which he was found guilty and he says that the trial court should, therefore, have granted his Crim.R. 29(A) motion for acquittal on each count. He further contends that his convictions were against the manifest weight of the evidence.

{¶202} While Newberry challenges every count for which he was found guilty, any error with respect to the sufficiency or manifest weight of the evidence on the felonious-assault, murder, aggravated-arson and aggravated-murder-under-R.C. 2903.01(B) counts is harmless beyond a reasonable doubt because those counts were merged into aggravated murder under R.C. 2901.01(A) at sentencing. *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14 ("When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless * * *."), citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990).

{¶203} Therefore, in addressing these assignments of error, we consider only whether the convictions for aggravated murder under R.C. 2901.03(A), kidnapping, aggravated burglary and having weapons under disability were supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶204} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to

support a verdict is a question of law. *Thompkins* at 386, 678 N.E.2d 541.

{¶205} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime."). We must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

\*    \*    \*

{¶208} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g., State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 25, citing *State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

{¶209} A person commits aggravated murder under R.C. 2903.01(A) by purposely causing the death of another with prior calculation and design. R.C. 2903.01(A). "The element of prior calculation and design 'require[s] a scheme designed to implement the calculated decision to kill.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316,

¶ 31, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978).

{¶210} A person commits kidnapping under R.C. 2905.01(A)(3) by, through force, threat or deception, removing another person from the place where the other person is found or by restraining the liberty of that person, for the purpose of terrorizing or inflicting serious physical harm to anyone. R.C. 2905.01(A)(3).

{¶211} A person commits aggravated burglary under R.C. 2911.11(A)(1) by trespassing, by force, stealth or deception, in an occupied structure while someone is present in the structure with the purpose to commit in the structure any criminal offense where the offender inflicts, or attempts or threatens to inflict physical harm on another.

{¶212} A person commits the crime of having weapons while under disability by knowingly acquiring, having, carrying or using any firearm if the person has been convicted of certain felony offenses. R.C. 2923.13(A)(3). In order to "have" a firearm, an individual must either actually or constructively possess it. *E.g., State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 16.

{¶213} Here, the fact that these crimes were committed is not in dispute. Newberry instead argues that the state did not offer sufficient evidence to prove beyond a reasonable doubt that he committed those crimes or was complicit in their commission. Our court has held that a person who aids and abets a principal offender in the commission of a crime constructively possesses a firearm possessed solely by the principal offender. *See, e.g., Adams* at ¶ 19 (collecting cases); *but see State v. Lewis*, 2d Dist. Greene No. 96CA12, 1997 WL 156596, 1997 Ohio App. LEXIS 1316 (Apr. 4, 1997).

{¶214} Ohio's complicity statute, R.C. 2923.03, states as follows:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
>> (1) Solicit or procure another to commit the offense;
>>
>> (2) Aid or abet another in committing the offense;
>>
>> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>>
>> (4) Cause an innocent or irresponsible person to commit the offense.

{¶215} To "aid or abet" is to "'assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 26, quoting *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001). R.C. 2923.03(F) provides that a person who violates the complicity statute "shall be prosecuted and punished as if he were the principal offender."

{¶216} As the Ohio Supreme Court recently described:

> "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson* at syllabus. "'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.* at 245, 754 N.E.2d 796, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273

87

N.E.2d 884 (4th Dist.1971).

*McFarland* at ¶ 29.

{¶217} The question here, then, is whether there was sufficient evidence presented for a rational trier of fact to find beyond a reasonable doubt that Newberry committed or was complicit in the crimes committed against Paul and P.B.

{¶218} While the state's case was admittedly circumstantial, we find that there was sufficient evidence to support Newberry's convictions based on his participation or complicity in the scheme to rob, kidnap and murder Paul and P.B.

{¶219} Newberry associated with Gibson and Sheeley in the summer and into the fall of 2018. Three weeks before the murders, Newberry purchased the dark blue Ford Edge that would be used throughout these crimes. He directed that the car be registered in someone else's name and he caused the windows of the vehicle to be tinted. Newberry returned the vehicle to the dealership less than three weeks after the murders. The car had been detailed before it was returned, rendering certain forensic tests futile. In light of the other evidence in the case, a rational trier of fact could conclude that Newberry procured, altered, cleaned and returned the car in the ways he did to assist in the commission of the robbery–murder scheme.

{¶220} The evidence supports a conclusion that Newberry was involved in the scheme in other ways, too. Newberry and Sheeley were with Gibson at around 3 p.m. on October 9, 2018, the day before the murders, driving Gilbert to work. Newberry was captured on surveillance footage entering his Ford Edge at a gas station near to the presumed murder scene, with Gibson, at 12:48 a.m. on October 10, 2018. The two leave the parking lot in the vehicle, together.

{¶221} Gibson's phone moved from East Cleveland to

Bedford between 2 a.m. and 4 a.m.; a witness described seeing a dark-colored vehicle driving slowly past Paul B.'s home in the early morning hours of October 10. Gibson's phone is in Bedford between 4 a.m. and 6 a.m. While Newberry's phone shows no activity during this time, DNA collected from an examination glove in Paul B.'s home matched Newberry's DNA; a match was 182,000 times more probable than a coincidence. When Newberry's car was swabbed later, there was positive match support found for P.B.'s DNA in the rear seat on the armrest. Swabs taken from the car also tested positive for gasoline and a medium petroleum distillate, the same kind of accelerants that were found spilled throughout Paul B.'s home. Items of value from Paul's home had been stolen and were later seen in Gibson's possession.

{¶222} Between 6 a.m. and 8 a.m., Gibson's phone moved into the East Cleveland area. When Newberry's phone next pinged off a cell tower at 6:55 a.m., it was in the East Cleveland area. Between that time and 8:30 a.m., Newberry's and Gibson's phones used the same side of the same cell tower, indicating that they were in the same general area at the same time. Newberry's car is seen on the gas station surveillance video at 7:40 a.m. and 7:47 a.m. At the latter time, the vehicle is traveling through the parking lot in the direction of Wadena Avenue. Newberry's car is seen on surveillance from a home on Wadena Avenue, traveling with Paul's rental car.

{¶223} Gibson is seen on surveillance footage bringing the gas can from the direction of Wadena Avenue to the gas station. He is recorded making a phone call from the gas station, and records show that he was talking with Newberry's phone. Gibson then exits the gas station, walking in the direction of Wadena Avenue and the vacant lot where Paul's burning car would be found later that morning. P.B. had been shot to death and Paul had been struck on the head and then burned alive.

{¶224} When Newberry was interviewed by police,

89

he claimed that a "Jamaican Shawn" had his car and phone that entire night. Police later determined that no such person exists.

{¶225} These facts support the inference that Newberry was "more than a mere bystander" in these crimes. *See State v. High*, 2018-Ohio-2236, 115 N.E.3d 702, ¶ 34 (8th Dist.); *State v. Riley*, 8th Dist. Cuyahoga No. 107073, 2019-Ohio-981, ¶ 46.

{¶226} This evidence is sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that Newberry either committed or assisted and facilitated these offenses.

*Newberry*, 2023 WL 6475159, at *23–27.

Newberry complains that "[a]ll of the evidence presented against [him] was circumstantial and lacking reliability." Doc. 19-1, at 2; Doc. 23, at 30–32. But "[c]ircumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal quotations and citations omitted); *see Durr*, 487 F.3d at 449 ("circumstantial evidence is entitled to equal weight as direct evidence"). As for Newberry's claim that the evidence lacked reliability, this Court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown*, 567 F.3d at 205; *see also Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

Newberry argues that in finding sufficient evidence of guilt, the Ohio court of appeals relied on isolated, lawful acts—"(1) purchasing a vehicle, (2) registering a vehicle under his mother's name, (3) tinting car windows, (4)

detailing the vehicle, (5) driving his car to a gas station in the East Cleveland area, and (6) utilizing cell towers in the East Cleveland area where he resided at the time of the homicides." Doc. 23, at 30. But the court reviews the entire record "in the light most favorable to the prosecution," and asks if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Cavazos*, 565 U.S. at 7 ("a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at 326). This is what the Ohio court of appeals did, *Newberry*, 2023 WL 6475159, at *24, 26–27, and its sufficiency determination was not unreasonable under Supreme Court precedent.

**Conclusion**

For the reasons set forth above, I recommend that Newberry's Petition be denied.


Dated: January 30, 2026

    */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).